(Nos. 29003-4.—

THE DEPARTMENT OF REVENUE, Appellee, *vs.* THE JEN-NISON-WRIGHT CORPORATION, Appellant.—THE DE-PARTMENT OF REVENUE, Appellee, *vs.* THE MIDLAND CREOSOTING COMPANY, Appellant.

*Opinion filed March 20, 1946—Rehearing denied May 16, 1946.*

Pope & Driemeyer, of East. St. Louis, for appellants.

George F. Barrett, Attorney General, (William C. Wines, and Raymond S. Sarnow, of counsel,) for appellee.

Mr. Justice Murphy delivered the opinion of the court:

The questions for decision in Department of Revenue v. Jennison-Wright Corporation, No. 29003, and Department of Revenue v. Midland Creosoting Company, No. 29004, pertain to similar factual situations and involve the application of the same principles and, therefore, they have been consolidated for opinion. The inquiry is as to whether the State can collect an occupation tax on certain phases of the business conducted by the two corporations. (Retailers' Occupation Tax Act, Ill. Rev. Stat. 1945, chap. 120, par. 440 *et seq.*) In No. 29003, the Department, through its authorized agencies, determined a tax was due which, with penalties, totaled $6427.98. In No. 29004, the amount, with penalties, was $3425.94. The taxable period in No. 29003 was from January, 1940, through December, 1941. In No. 29004, it extended from January through December, 1939. On review in the circuit court of Madison county, the finding of the Department in each case was sustained.

The Midland company was dissolved in December, 1939, and was succeeded by the Jennison-Wright Corporation. It took over Midland's property and, it is conceded, became

liable for any taxes due from its predecessor. The two corporations engaged in the same line of business and pursued it by the same methods, so that it will not be necessary to take notice of the change from one corporation to the other. They will be referred to as appellants.

Both were organized under the laws of Ohio and were licensed to do business in this State. Their plant and principal place of business in this State is at Granite City. Their primary activity is the treatment of wood products by the injection of preservative oils to prevent decay. Most of the preservative used is creosote, and the treatment is commonly known as creosoting. The evidence shows that in the early stages of the business it was confined to the one activity but in more recent times they have extended their business so that they are, to a considerable degree, engaged in selling wood products at retail, such as railroad crossties, posts, bridge timbers, piling and wooden floor blocks. The question of liability arises on some phases of this extended business.

All the transactions on which the tax was imposed are cases where the articles sold originated in another State and were moved by common carrier to appellants' plant at Granite City, where they were treated, and then to the consumer. The consumers in the instant cases were railroad companies or coal-mining corporations. An explanation of the processing of the timbers will aid in understanding the methods of business followed by appellants. Timber cut from a tree is shaped and cut into lengths. In this stage it is referred to in the trade as "green timber." Before it may be creosoted, it must pass through a twelve-to-eighteen months' air-seasoning period. After it is seasoned, it is given the creosoting process which takes six to eight hours. It is ready for use immediately after the treatment process has been completed. As stated, the timbers originated in another State and in some instances were stacked for the seasoning period in some central place at point of origin.

In other cases they were moved in the green stage to appellants' plants where they were stacked for seasoning. Whether the seasoning occurred at the point of origin or in the yards, the timbers were ultimately creosoted at appellants' plants at Granite City. The sales in question involved large quantities of timbers and the several transactions, although of the same general pattern, are different in some respects, so that it will be necessary to mention the facts of some.

Appellants contend that some of the wood products came into their possession in Illinois as bailees; that the title never passed to them, and that all they did was render service, which is not taxable. In other transactions, appellants assume that if there was a sale, it did not occur within this State, and, being an out-of-State sale, was not subject to tax. A further contention which applies to all the sales included in the two cases is that the timbers, having moved from point of origin in another State to this State, were so much a part of interstate commerce that any tax imposed on such business would violate the interstate commerce clause of the Federal constitution.

In *Standard Oil Co.* v. *Department of Finance,* 383 Ill. 136, section 2 of the Retailers' Occupation Tax Act was construed. It was held that the statute, as it existed prior to the amendment of July 1, 1941, made provision for the imposition of a tax upon the business of making sales of tangible personal property at retail "in this State" and that it was limited to sales where the passing of the title from the vendor to the ultimate consumer occurred in this State. It was held that the intent, as expressed by the amendment, was to remove the restriction which formerly existed by limiting the operation of the statute to sales consummated by the passing of title within the State, and to leave the computation of the tax upon gross receipts to all sales regardless of where they occurred, provided the sale was made in the course of the business of an occupation located

in this State. Other opinions adopted at the same time applied the statute in the same way but covered different factual situations. (*Ex-Cell-O Corp.* v. *McKibbin,* 383 Ill. 316; *Allis-Chalmers Mfg. Co.* v. *Wright,* 383 Ill. 363; *Ayrshire Patoka Collieries Corp.* v. *Nudelman,* 383 Ill. 345.) Insofar as the decision here involves the application of the statute to situations which occurred before the amendment and those that took place thereafter, the cases referred to are controlling.

The first transaction is as to the taxable liability of appellants in their business dealings with the Illinois Central Railroad Company. This transaction extended over a period of two years beginning with the purchase of the timber from a producer in Alabama and continuing through the seasoning period, the treatment process and the delivery of the article to the railroad. Appellants contend that in these transactions they were bailees. The facts are that the written order of the railroad company to appellants provided that appellants were to furnish certain specified timbers to the railroad company at a stated price F.O.B. cars, East St. Louis, Illinois. The order was given and accepted in Illinois. It did not state that the products sold were not in existence when the order was placed, but the undisputed evidence is that the parties understood that the timbers specified in the order must be secured from some third party. The railroad company directed that they were to come from a certain area. For illustration, in certain instances it was agreed that the article ordered should be obtained at Red Bay, Alabama. Within a few days after the terms had been agreed upon by both parties, appellants placed an order for the timbers with a producer at Red Bay. The arrangement between appellants and the producer was that the timbers were bought subject to inspection and approval of the railroad at Red Bay. After inspection and approval by the railroad, cars containing the timbers were consigned by the producer to appellants at

Granite City. Appellants paid the producer and the railroad assumed the freight charges, a principal part of the haul being on their own lines. The timbers were unloaded by appellants in their yards at Granite City and stacked for the air-seasoning period. In connection with the stacking, the timbers were marked to identify them as being the same as had been inspected and approved by the railroad at point of origin. During the seasoning period, the railroad employees visited appellants' yards and inspected the timbers. It appears that it was for the railroad to determine when they were fully seasoned, for after the completion of the seasoning period the railroad directed appellants that the oil treatment be given. Their treatment was subject to the railroad's further inspection as to thoroughness and depth of penetration of the oils. After they were treated and the railroad approved, appellants loaded the timbers on cars. The railroad company then paid the price which had been agreed upon approximately two years before. Such price was not broken down as to the items included, but the evidence shows that the price which the railroad paid appellants was approximately twice the amount paid by appellants to the producer. Appellants' evidence is that the treatment cost was about 30 per cent of the sale price.

The difference in the effect upon the title as between bailments and sales is well defined. In bailments, the title is not changed by the delivery of the property, while in the case of a sale it is transferred. Appellants contend the facts make a basis for application of the principle announced in *Chickering* v. *Bastress,* 130 Ill. 206, and other cases, that when the identical thing delivered is to be restored in the same or an altered form, the contract is one of bailment and the title to the property is not changed.

It may be conceded that the identity of the timbers purchased from the producer at point of origin in another State is established as being the same timbers ultimately

delivered to the railroad but that is not sufficient to call for the application of the principle in reference to a bailment. The further inquiry is as to who receives the title from the producer. The principle for which appellants contend is dependent upon the fact that the one who is delivering the property is the owner and that he is taking it to the bailee to have work performed upon it. The facts in this case are in conflict with any theory that the railroad company purchased the timbers from the producer. Appellants made the contract with the producer whereby the latter was to load the timbers on cars at point of origin. They were sold F.O.B. cars at point of origin consigned to appellants, and they in turn paid the producer the contract price.

The general rule is that the delivery of personal property by the seller to a common carrier to be conveyed to the purchaser is a delivery to the purchaser and that the title to the property vests in the purchaser immediately upon its delivery to the carrier. *City of Carthage* v. *Duvall,* 202 Ill. 234; *Ellis* v. *Roche,* 73 Ill. 280.

The fact that the railroad inspected the timbers at point of origin and later transported them to this State without charge to appellant, would not, in view of all the circumstances, show that the parties intended that the title to the property should pass from the producer to the railroad company. The construction of a contract is to ascertain the intention of the parties, and there is no more convincing evidence of what the parties intended than to see what they did in carrying out its provisions. The title to the timbers passed, from the producer to appellants and remained there until appellants completed the treatment process and delivered them F.O.B. cars, East St. Louis, Illinois. The transaction was a sale and not a bailment.

Appellants sold treated crossties to the Superior Coal Company and Chicago Great Western Railway Company. The contracts in each case were made in Illinois. Upon

receiving requests from the companies, appellants advised them that they did not have the ties wanted in their stock at Granite City, but it was suggested that such ties could be supplied by appellants from their stocks then located at various points in Missouri. The suggestion was accepted and appellants arranged with their employees in Missouri to load the ties on cars to be moved to Granite City. Such ties had been seasoned in Missouri and when unloaded at appellants' plant at Granite City, the oil treatment was given at once. They were then reloaded to be sent to destination. Moving in the regular course, the ties were in the Granite City yards about 24 hours. The railroad company inspected the ties at Granite City but there was no inspection by the coal company. A notation on the invoice issued by appellants to the coal company was "ties to originate at Salem, Missouri, treated at our plant Granite City, Illinois, and reshipped to destination. No occupational tax applies." The price was so much per tie, according to grade. It included the cost of treatment, which the evidence shows was from 25 per cent to 30 per cent of the total charge.

The objection is that these transactions were not sales at retail in this State. Paragraph 1 of section 1 of the act defines sales at retail to mean, "Any transfer of the ownership of, or title to, tangible personal property to the purchaser, for use and consumption and not for resale." Appellants contend the sales were of specific ties in Missouri, and the title to the ties passed to the coal company and the railway company, respectively, in Missouri. The facts do not support such contention. The order for the ties signed by the purchasing agent of the railway company directed the materials were to be shipped F.O.B., C.G.W. tracks on through billing to Elmhurst *via* Chicago, or Egan, Illinois, *via* S. Freeport. The ties to the coal company were sold F.O.B. the company's mine at Benld, Illinois.

The sales to these companies occurred before July 1, 1941, the effective date of the amendment of section 2, so that under the authority of *Standard Oil Co.* v. *Department of Finance,* 383 Ill. 136, the tax was restricted to sales made where the title passed within the State. The inquiry is as to whether the title passed to the purchaser at point of origin in Missouri, or whether it passed in Illinois.

Subparagraph (1) of section 18 of the Uniform Sales Act (Ill. Rev. Stat. 1945, chap. 121½, par. 18,) provides that where there is a contract to sell specific or ascertained goods, the property is transferred to the buyer at such time as the parties intend, and in subparagraph (2) of the section it is said that in ascertaining the intent, regard shall be had to the terms of the contract, conduct of the parties, usages of trade and the circumstances of the case.

In the case of the coal company, the contract provided for a sale F.O.B. the company's mines at Benld. The railroad contract was a sale F.O.B. certain points on its line in Illinois. The general rule is that in the absence of a contrary intention a sale under such circumstances will be deemed to pass the title at the point designated. 46 Am. Jur. p. 609.

Appellants' position is based upon the assumption that there was a contract of sale to sell specific ties which were then located in Missouri. As stated, the facts do not support such assumption but conceding that such was the fact, then, unless there was other evidence of intent, rule 2 of section 19 of the Uniform Sales Act would be applicable and defeat appellants' contention. Rule 2 directs that where there is a contract to sell specific goods and the seller is bound to do something to the goods for the purpose of putting them into a deliverable state, the title does not pass until such thing be done. On either theory, the contract was for a sale at retail in Illinois.

In No. 29003, it was stipulated that Jennison-Wright conducted business with the Chicago Great Western Railroad Company after the effective date of the amendment of section 2, July 1, 1941, in the same manner as Midland had before such date. Sufficient facts have been stated to show that the contracts of sale would be within the statute after the amendment as well as before.

Sales by appellants to the Wabash Railway Company have a different factual background. In the cases previously considered, the sale of timbers and the treatment process were included in one contract, which would have to be construed as a contract for sale of seasoned, treated timbers. In the transactions with the Wabash, appellants had two contracts, one of which is referred to in the record as the seasoned tie contract, and the other as the treatment contract. In computing the tax, the Department combined the amounts paid appellants on both contracts. The effect of such ruling was to hold that the transaction under the two contracts was for the sale and delivery of timbers completed, both as to seasoning and treatment.

Appellants contend that the two contracts pertained to different subject matters, that they are severable, and that the treatment contract being for service, only, the amount paid under it should not be included in the computation of the tax. The evidence shows that in 1940 appellants delivered to Wabash untreated crossties for which it was paid $48,282.47. During the same period, they received for creosoting the same ties $7849.85. They also received another item on account of such crossties, $1729.21 for adzing and boring. The total received was $57,851.53. In 1941, the three items were: untreated crossties $105,229.77, oil treatment of the same ties $16,439.86, adzing and boring of ties $3454.82. Combined total of each year was used by the Department in computing the tax due.

The seasoned-timber contracts were entered into approximately two years before the articles contracted for

were to be delivered, and, in fact, the contracts were executed before the timbers sold were in existence. Attached to the contract as a part thereof was a schedule of specifications. Provisions in the contract and schedule indicate the places in Missouri where the timbers were to be produced and the size, grade and price. It specified the location in Missouri where they were to be stacked for the seasoning period. Provision was made as to the method and manner of stacking and the inspection of the ties by Wabash during the seasoning period. There was a provision whereby appellants agreed that, on the completion of the seasoning period, they would deliver the timbers to Wabash at a wood preserving plant designated by Wabash. It also provided that the timbers covered by the contract should be shipped from point of origin to the wood preserving plant designated by it. In providing for the freight charges, it was stated that it was assumed that the F.O.B. point was at Nameoki, Illinois, on the Wabash line. Appellants were to pay the freight from the point of origin in Missouri to the Wabash line at East St. Louis, and Wabash was to assume the freight charges from East St. Louis to Nameoki. The purchase price was to be paid after Wabash had inspected and approved the ties at the treatment plant. Invoices were to be issued by appellants when the ties were loaded at the treating plant for shipment. Such invoices were to be paid in thirty days. The contract contained a provision that the ties should be deemed to be the property of the tie company (appellants) until inspected and accepted by the railway company at the wood-preserving plant designated by it.

The treatment contract was not made at the same time as the seasoned-tie contract. It referred to the treatment of forest products generally and contained a provision that Wabash was to furnish the products to be treated. The price per piece was fixed. As the treating process was applied, appellants loaded the timbers on cars for shipment.

Invoices were to be sent as the products were shipped and the price for treatment as per contract. The ties were shipped on direction of Wabash, but if any remained more than six months after treatment, there was to be an added charge. The contract did not refer to any particular lot of timbers nor did it specify the point of origin. Under its terms, Wabash had the right to send appellants timbers. for treatment that had been purchased by it from some other company.

The contracts referred to different subject matters and the methods provided by them for handling the business makes them separable. There is no evidence, and, in fact, it is not claimed, that the taxpayer adopted the two contracts as a subterfuge to defeat a part of the tax.

It is well settled that if the thing sold is a service and not a sale of tangible personal property, the one furnishing such service is not engaged in a business that is subject to the tax. (*Ahern* v. *Nudelman,* 374 Ill. 237; *C. & E. Marshall Co.* v. *Ames,* 373 Ill. 381; *Bradley Supply Co.* v. *Ames,* 359 Ill. 162.) Under the circumstances of appellants' dealings with Wabash, the sale of seasoned ties was subject to the tax but the treatment contracts were for services and the Department erred in computing a tax on the amounts paid for such services.

There is evidence of sales to other railroads and coal companies but the methods of transacting the business were not so materially different as to change the rule of taxable liability as declared in some of the cases discussed.

We come now to appellants' proposition which applies to all the sales involved in these cases. It is that the tax is computed upon the sale price of property which moved from point of origin in another State to its destination in this State, and that a tax imposed on such business is a burden on interstate commerce and violates the commerce clause of the Federal constitution. This question was not presented in *Standard Oil Co.* v. *Department of Finance,*

383 Ill. 136. In *Superior Coal Co.* v. *Department of Finance,* 377 Ill. 282, the question was as to whether the sale price of coal delivered to a purchaser in this State and thereafter moved by him into channels of interstate commerce was a proper basis for the computing of an occupation tax against the vendor. It was held that it did not violate any Federal constitutional rights. Thus far consideration has been given to the place where the title to the property passed to the purchaser, and it has been determined in each instance that such event occurred in Illinois. It will be noted that in most cases the contracts were made in contemplation that the property sold would originate in another State. There is evidence of sales made by appellants where the articles were sold without regard to point of origin.

It is settled that the tax authorized by the act in question is an occupation tax imposed upon persons engaged in the business of selling tangible personal property at retail in this State, and that it is not a tax upon sales, although the tax is measured by the gross receipts from such sales. (*Mahon* v. *Nudelman,* 377 Ill. 331; *Herlihy Mid-Continent Co.* v. *Nudelman,* 367 Ill. 600; *Reif* v. *Barrett,* 355 Ill. 104.) Nor is it a property or privilege tax imposed upon purchasers. *People's Drug Shop Inc.* v. *Moysey,* 384 Ill. 283; *Svithiod Singing Club* v. *McKibbin,* 381 Ill. 194.

It is well established that a State is prohibited, under the commerce clause, from placing a tax upon interstate commerce that causes it to be operated at a disadvantage as compared to, or in competition with, intrastate commerce. In other words, a State tax which discriminates against interstate commerce violates constitutional rights.

In *McGoldrick* v. *Berwind-White Coal Mining Co.* 309 U.S. 33, 84 L. ed. 565, the court said: "It was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax bur-

dens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business. * *₀ * Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless fall short of the regulation of the commerce which the Constitution leaves to Congress." In referring to instances where a State tax had been sustained even though it touched or concerned property which had moved in interstate commerce, the court said: "The like taxation of property, shipped interstate, before its movement begins, or after it ends, is not a forbidden regulation. * * * Nor is taxation of a local business or occupation which is separate and distinct from the transportation or intercourse which is interstate commerce, forbidden merely because in the ordinary course such transportation or intercourse is induced or occasioned by such business, or is prerequisite to it."

In *Minnesota* v. *Blasius,* 290 U. S. 1, 78 L. ed. 131, the court, speaking through Mr. Chief Justice Hughes, said: "Because there is a flow of interstate commerce which is subject to the regulating power of Congress, it does not necessarily follow that, in the absence of a conflict with the exercise of that power, a state may not lay a non-discriminatory tax upon property which, although connected with that flow as a general course of business, has come to rest and has acquired a situs within the state."

There are many decisions of the Supreme Court of the United States which note the distinction between interstate commerce or the instrumentalities thereof on the one hand, and those activities which are mere incidents that may or may not attend the carrying on of such commerce. (*Williams* v. *Fears,* 179 U.S. 270, 45 L. ed 186; *Western Live Stock* v. *Bureau of Revenue,* 303 U.S. 250, 82 L. ed.

823.) If the purpose is to impose a tax upon something which is a mere incident of interstate commerce, then the tax does not violate the commerce clause.

Application of principles well established by the decisions of the United States Supreme Court demonstrates that the occupation tax computed on appellants' business did not, as to the sales in evidence, rest directly on business devoted to interstate commerce. The situs of the occupation was in Illinois and, as stated, the title to the timbers sold passed to the purchaser in Illinois. The fact that appellants acquired the property to fulfill their contracts from points beyond the State was merely incidental to their business. The further fact that a condition of the sales was that the purchasers had the right to inspect the products at point of origin, did not alter the general purpose of the contract or change the otherwise clearly-expressed intent that the title to the property should pass to the purchaser in this State.

In the *McGoldrick case,* the city of New York had the power, for a limited period, to lay a tax upon certain purchasers for consumption of certain tangible personal property. The Berwind-White Coal Mining Company had an obligation resting upon it so that it could protest the payment of the tax. The company was organized under the laws of Pennsylvania and was engaged in the mining and selling of coal. It maintained a sales office in New York City and at such place accepted orders for delivery of coal from its mines to the consumer in New York City. The coal was moved by rail from the mines to Hoboken, N. J., thence by barge to destination, which was point of delivery to the purchaser, the situs of which was in the city of New York. The court said that it could not find an "adequate basis for distinguishing the present tax laid on the sale or purchase of goods upon their arrival at destination at the end of an interstate journey from the tax which may be laid in like fashion on the property itself. That the latter

is a permissible tax has long been established by an un-wavering line of authority. [Citations.] As we have often pointed out, there is no distinction in this relation-ship between a tax on property, the sum of all the rights and powers incident to ownership, and the taxation of the exercise of some of its constituent elements. * * * If coal situated as that in the present case was, before its delivery, subject to a state property tax, * * * transfer of possession of the coal upon a sale is equally taxable. (*Wiloil Corp.* v. *Pa.* 294 U. S. 169, 79 L. ed. 838.)" In discussing the contention that the vice of the tax was that it was computed by the gross receipts from interstate com-merce and thus, in effect, reaches for taxation the com-merce carried on both within and without the taxing State, the court said: "It is true that a state tax upon the opera-tions of interstate commerce measured either by its volume or the gross receipts derived from it has been held to in-fringe the commerce clause, because the tax, if sustained, would exact tribute for the commerce carried on beyond the boundaries of the taxing state, and would leave each state through which the commerce passes free to subject it to a like burden not borne by intrastate commerce."

In distinguishing the character of the tax imposed in this case and that imposed in *J. D. Adams Manufacturing Co.* v. *Storen,* 304 U.S. 311, 82 L. ed. 1369, the court noted the difference between a tax on gross receipts of sales mov-ing in interstate commerce and a tax conditioned upon the exercise of the taxpayer's franchise or privilege to transact business or manufacture a certain article. It was said in reference to the latter tax that it would have been sus-tained "despite its incidental effect on interstate commerce since the taxpayer's local activities or privileges were suffi-cient to support such a tax, and that it could fairly be measured by the sale price of the goods."

The tax imposed on the occupation in which appellants were engaged did not discriminate against interstate com-

merce. One engaged in this State in the occupation of selling, at retail, articles which moved intrastate is subject to the same tax as is the one who engages in the sale of articles that moved interstate.

Reference is made to the notation on the invoices issued by appellants on the Superior Coal Company sales. Such notations are hereinbefore set forth. It is argued that such statement indicates the intention of the parties to make the sales of an interstate character. In *Superior Oil Co.* v. *Mississippi,* 280 U. S. 390, 50 Sup. Ct. 169, referring to a document offered for a similar purpose, it was said that it was "not within the power of the parties by the form of their contract to convert what was exclusively a local business, subject to state control, into an interstate commerce business, protected by the commerce clause."

We have given careful consideration to *In re Globe Varnish Co.* 114 Fed. 2d 916, relied upon by appellants, but we find that the majority opinion in that case did not make the distinction between transportation in interstate commerce and that which is referred to as mere incidents of such transportation, as to the character of the tax imposed, as the Supreme Court of the United States did in the *McGoldrick case,* and other cases cited therein. The tax imposed on the sales involved in these cases was not in violation of the commerce clause of the Federal constitution.

The judgments in No. 29003 and No. 29004 approving the determination of the tax by the Department of Revenue are affirmed as to all such determinations except the one which refers to the sales to the Wabash Railway Company. As to such sales, the judgment is reversed and the cause remanded with directions to proceed in accordance with the views expressed.

> *Affirmed in part and reversed in part and remanded, with directions.*