(No. 33550.—

PRESSED STEEL CAR COMPANY, INC., Appellee, *vs.* RICHARD
J. LYONS, Director of Revenue, *et al.*, Appellants.

*Opinion filed September 23, 1955—Rehearing denied Nov 21, 1955.*

LATHAM CASTLE, Attorney General, of Springfield, (WILLIAM C. WINES, and RICHARD L. COOPER, of counsel,) for appellants.

SIDLEY, AUSTIN, BURGESS & SMITH, of Chicago, (KENNETH F. BURGESS, WILLIAM H. AVERY, JR., EMERSON T. CHANDLER, and ARTHUR R. SEDER, of counsel,) for appellee.

ESSINGTON, McKIBBIN, BEEBE & PRATT, and STEVENSON, CONAGHAN, VELDE & HACKBERT, of Chicago, and BROWN, HAY & STEPHENS, of Springfield, (HAMILTON K. BEEBE, ROBERT A. STEPHENS, JR., WALTER H. VELDE, and WILLIAM W. FULLAGAR, of counsel,) *amici curiae.*

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This is the fifth in a series of cases in which we have been asked to pass on the constitutionality of the Illinois Retailers' Occupation Tax Act, (Ill. Rev. Stat. 1953, chap. 120, pars. 440-453,) as applied to sales of various commodities by railroad suppliers to railroads for use outside of Illinois. (See *Superior Coal Co.* v. *Department of Finance,* 377 Ill. 282; *Department of Revenue v. Jennison-Wright Corp.* 393 Ill. 401; *Moffat Coal Co.* v. *Daley,* 405 Ill. 14; *Superior Coal Co.* v. *Department of Revenue,* 4 Ill. 2d 459.) While the general theme is recurrent, the

precise question here presented is one of first impression because in this case the goods were shipped to the purchasing railroads at out-of-State destinations under standard uniform bills of lading. That fact either was not present or was not emphasized in the earlier cases.

Pressed Steel Car Company, Inc., manufactures railroad equipment in its plants in Illinois for sale both within and without the State. It is subject to the tax which is imposed on those "* * * engaged in the business of selling tangible personal property at retail in this State * * *." (Ill. Rev. Stat. 1953, chap. 120, par. 441.) A "sale at retail" is defined as "any transfer of the ownership of, or title to, tangible personal property to the purchaser * * *." (Par. 440.) The tax is computed on the basis of a percentage of gross receipts from such sales. (Par. 441.) "However, such tax is not imposed upon the privilege of engaging in any business in interstate commerce or otherwise, which business may not, under the constitution and statutes of the United States, be made the subject of taxation by this State." Par. 441.

The transactions which are the basis of this test case are fifteen sales made in November, 1952, and February, 1954, to five railroads. All but one of the railroads placed their orders from their Chicago offices and these orders were accepted at Pressed Steel's Chicago office. The goods were then shipped by Pressed Steel under a uniform straight bill of lading from one of its Illinois plants to the purchasing railroad at a destination outside of Illinois. Some of the orders stated that title, or title and possession, should not pass to the consignee until the goods reached their destination, and some provided that the goods would be subject to inspection at destination. In each instance the purchasing railroad received the goods in Illinois. In some instances the goods were delivered to it at once at the seller's plant. In others the goods were originally delivered to another railroad and were turned over to the pur-

chasing railroad at a junction point within Illinois. In some instances the orders specified that the freight should be prepaid and it was. In others the goods were shipped collect and the seller deducted the freight charges from the invoiced price of the goods. In those instances in which the goods were carried by another railroad from the seller's plant to an Illinois junction point on the line of the purchasing railroad, the originating carrier was paid, through interline settlements, its share of the joint through rate rather than the local rate between the two Illinois points.

Pressed Steel paid the tax measured by these sales under protest and brought this action to recover the amount so paid. (Ill. Rev. Stat. 1953, chap. 127, par. 170-176a.) After a trial the circuit court of Cook County granted the relief prayed on the ground that imposition of the tax upon these transactions was forbidden by the commerce clause of the Federal constitution and therefore also forbidden by paragraph 441 of the Retailers' Occupation Tax Act. The defendants have appealed.

The issues presented are narrow. It is not disputed that the events which occurred in Illinois are sufficient to sustain the tax upon due process grounds, nor is it contended that the tax discriminates against interstate commerce. Upon oral argument counsel for Pressed Steel stated that the place of passage of title "is unimportant" and that the precise method of handling the freight charges "is immaterial." And it is not disputed that a transfer of possession in accordance with a contract of sale is a transfer of "ownership" within the meaning of the act.

The argument against the tax is based upon the commerce clause of the Federal constitution, and stresses the intention of the seller and the purchaser that the goods sold should be shipped to a destination outside of Illinois, and the fact that the goods were actually so shipped. It appears to be settled, however, that a transaction by which

a purchaser buys goods which are delivered to him within the taxing State may properly measure a tax, even though both parties know that the goods are purchased for use outside of the State, and they are so used. *Superior Oil Co.* v. *Mississippi,* 280 U.S. 390; *Department of Treasury* v. *Wood Preserving Corp.* 313 U.S. 62; *International Harvester Co.* v. *Department of Treasury,* 322 U.S. 340; *Superior Coal Co.* v. *Department of Finance,* 377 Ill. 282; *Department of Revenue* v. *Jennison-Wright Corp.* 393 Ill. 401; *Moffat Coal Co.* v. *Daley,* 405 Ill. 14; *Superior Coal Co.* v. *Department of Revenue,* 4 Ill. 2d 459.

The basic contention is that what the railroads received in Illinois was no more than custody as a carrier, and that possession with power of control and disposition was deferred until the purchasing railroad, as carrier, had delivered the goods to itself, as purchaser, at the out-of-State destination. This contention rests upon the fact that the goods were in each instance shipped under a standard, uniform bill of lading. A bill of lading is both a receipt for the goods shipped, and a contract to transport the goods as stipulated. (*Illinois Match Co.* v. *Chicago, Rock Island and Pacific Railway Co.* 250 Ill. 396, 402.) Inasmuch as the bill of lading used in each of these transactions required the railroads to deliver the supplies to themselves at an out-of-State destination, it is argued that they did not obtain possession of the supplies until such delivery was made.

Inherent in this contention is an assertion that the purchasing railroad has a dual personality when it carries goods consigned to itself so that its role as carrier is divorced from its role as purchaser. Because the commerce clause is concerned with substance rather than form, we turn at once to a consideration of the realities of the relationship between the seller and the purchasing railroads. That the railroad is technically obligated by its contract with the seller to deliver the goods purchased to the destina-

tion named in the bill of lading is conceded. But the circumstance that the carrier is also the consignee makes it difficult to see that any significant consequences would follow if the railroad should find it more convenient to transport the goods to a point other than the destination named in the bill of lading, whether within or outside of Illinois. There would be no problem in reaching agreement between carrier and consignee as to the substituted destination. And it is difficult to conceive of any realistic consideration which could prompt an objection by the seller. The bill of lading is not used here as a security device. The fact that Pressed Steel holds title to the goods and therefore bears certain minimal risks of loss in transit is not significant because once a carrier deviates from its contract of carriage without the consent of the consignor, the risk of loss shifts to the carrier until the deviation has been ended, (*Dunseth* v. *Wade*, 2 Scam. 285; *Merchants' Dispatch Transportation Co.* v. *Kahn*, 76 Ill. 520; *Benoit* v. *Central Vermont Railway*, 116 Vt. 266, 73 Atl. 2d 321; 33 A.L.R. 2d,) or ratified by acceptance of payment from the purchaser. (*Griggs* v. *Stoker Service Co.* 229 N.C. 572, 50 S.E. 2d 914.) In the absence of diversion, Pressed Steel bears only the risk of loss or damage caused by such uncommon occurrences as an act of God or the public enemy.

Certain rulings of the Interstate Commerce Commission have been cited to indicate that the commission has recognized the dual capacity of a purchasing railroad as carrier and as consignee. Other rulings seem to look the other way. The parties agree, for example, that the accounting regulations of the commission prohibit a purchasing carrier from treating as ordinary freight revenue any sums received for transporting over its own lines goods which it has purchased, and also prohibit the inclusion of any such freight charges, when assumed by the carrier as purchaser, in its "cost of materials" account. To us these rulings indicate that the commission considers that a carrier hauling its

own goods does so as a purchaser and not as an agent of the seller. But we need not attempt to ascertain the precise attitude of the Interstate Commerce Commission in this respect, for the position which it might find necessary or desirable for the purpose of its regulatory activities is not, in our opinion, relevant to determination of the problem before us.

It may be that the position of a common carrier transporting goods which it has purchased is sufficiently unique so that a taxing statute which treated such carriers differently from others who purchased and received possession of goods within the taxing State would not violate the equal protection clause. That, however, is not the issue before us. The question here is whether the State is compelled by the commerce clause of the Federal constitution to treat railroads who carry outside of the State the goods they purchase within it differently from others who do the same thing. The commerce clause provides that "The Congress shall have Power * * * To regulate commerce * * * among the several States * * *." In the absence of congressional action, we do not find in the language of the commerce clause or in any authoritative decision a requirement that a State must recognize for taxing purposes a dual personality on the part of railroads which are carriers of goods they have purchased.

Such doubt as exists stems from the decision of the Circuit Court of Appeals for the Seventh Circuit in *In re Globe Varnish Co.* 114 Fed. 2d 916, upon which the argument against the tax is largely based. There an Illinois railroad supplier shipped goods to out-of-State destinations *via* the purchaser railroads under standard bills of lading, f.o.b. point of origin. A majority of the court, after reviewing a number of decisions of the United States Supreme Court, stated: "The decisions which we have hereinbefore cited recognize this dual capacity, and, in the absence of fraud, approve of its application." (*id.*, 918.) The majority then

held that because of this dual capacity, the sales were interstate in character and thus insulated from the Illinois retailers' occupation tax by the commerce clause. We have carefully examined the decisions relied on by the Court of Appeals and have been unable to discover the recognition and approval of "dual capacity" upon which that court relied. See 35 Ill. L. Rev., 972, 973, n. 14.

Moreover, the subsequent decision of the United States Supreme Court in *Department of Treasury* v. *Wood Preserving Corp.* 313 U.S. 62, casts considerable doubt upon the soundness of the result reached in *Globe Varnish.* The *Wood Preserving Corporation case* (114 Fed. 2d 922) was a companion case to *In re Globe Varnish Co.* in the Circuit Court of Appeals. Similar facts were resolved by that court in similar fashion in the two cases. Subsequently, review by the United States Supreme Court was sought in both cases. A unanimous court reversed the judgment in the *Wood Preserving Corporation case. Certiorari* was denied in the *Globe Varnish case* on a procedural ground. 312 U.S. 690.

The United States Supreme Court in the *Wood Preserving Corporation case* had this to say which is pertinent to the contention that a bill of lading requiring delivery to an out-of-State destination indicated that a railroad was a carrier but not a purchaser: "These were local transactions,—sales and deliveries of particular ties by respondent to the Railroad Company in Indiana. The transactions were none the less intrastate activities because the ties thus sold and delivered were forthwith loaded on the railroad cars to go to Ohio for treatment. Respondent did not pay freight for that transportation and the circumstance that the billing was in its name as consignor is not of consequence in the light of the facts showing the completed delivery to the Railroad Company in Indiana. See *Superior Oil Co.* v. *Mississippi,* 280 U.S. 390."

The California courts have also had a series of railroad supplier cases under the California retail sales tax act. (*Standard Oil Co.* v. *Johnson,* 33 Cal. App. 2d 500, 92 Pac. 2d 470; 56 Cal. App. 2d 411, 132 Pac. 2d 910; 135 Pac. 2d 638, and 24 Cal. 2d 40, 147 Pac. 2d 577.) The first three of these decisions were by the District Court of Appeals. In the decision in 92 Pac. 2d 470, the court had held that sales similar to those in *In re Globe Varnish Co.* were interstate sales. However, in two later opinions (132 Pac. 2d 910, and 135 Pac. 2d 638) the court repudiated its earlier decision on the basis of the subsequent holding of the United States Supreme Court in the *Wood Preserving Corporation case,* saying: "The mere use of a standard bill of lading and a designation of respondent as consignor should not be allowed to change what is essentially an intrastate transaction into an interstate transaction." (135 Pac. 2d at 642.) The final California decision, (24 Cal. 2d 40, 147 Pac. 2d 577,) involved primarily an interpretation of the California statute and the regulations issued under it. In the course of its decision, however, the Supreme Court distinguished the *Wood Preserving Company case* upon the ground that there the seller did not pay the freight charges and the shipments were f.o.b. an Indiana point, while in the case before it the freight charges were prepaid by the seller and the shipments were f.o.b. an out-of-State destination. The parties to this case have felt that these variables do not affect the intrastate character of the transaction, and we agree. The *Wood Preserving* decision has been cited with approval by the United States Supreme Court many times (e.g., *International Harvester Co.* v. *Dept. of Treasury,* 322 U.S. 340, 344 *et seq.; Parke, Davis & Co.* v. *Cook,* 323 U.S. 681, 682; *Richfield Oil Corp.* v. *State Board,* 329 U.S. 69, 74,) and would seem to rest on a broader ground than is attributed to it by the California Supreme Court. As was stated in the *International Harvester Co. case* (322 U.S. at 345): "[In *Wood*

*Preserving*] * * * both the agreement to sell and the delivery took place in Indiana. Those events would be adequate to sustain a sales tax by Indiana."

Our analysis of the relationship between the seller and the purchasers in this case leads us to believe that the present transaction is intrastate and is subject to the tax. Unless the State is required by the commerce clause of the Federal constitution to recognize a rather fictional split personality on the part of the purchasing railroads, the only significant difference between the circumstances in this case and those involved in our earlier decisions with respect to railroad suppliers lies in the fact that by handling the transaction as it was handled here, the seller bears the risks of loss occasioned by an act of God or the public enemy. This difference is not sufficient, in our opinion, to compel the State to distinguish between railroads which purchase and receive delivery within the State intending to take the goods purchased to another State, and other purchasers who do the same thing. (Cf. *International Harvester Co. v. Dept. of Treasury*, 322 U.S. 340.) The primary activities which gave rise to the tax were intrastate. The peripheral circumstances which have added an interstate flavor do not, in our judgment, make them interstate.

The possibility that multiple taxation may result from the imposition of a use tax or some other tax by the State of destination appears to us to be no greater here than in the *Wood Preserving Co.* and *International Harvester* cases, in both of which the argument here made was pressed upon the Supreme Court but was rejected.

A separate argument is made with respect to the transactions which occurred in 1952. At that time the applicable regulations of the Department of Revenue, which had been revised to reflect the rule announced in the *Globe Varnish case,* stated that a sale was not deemed to be in interstate commerce when "the purchaser, *as such,* or his representative receives the physical possession * * * of such

property in this State." In 1953 the italicized words were eliminated, and a clause was added which expressly indicated that the tax was applicable when the goods were delivered to a purchasing carrier in this State. When the 1952 transactions took place the regulations of the Department provided that changes in the rules and regulations should operate "only *prospectively* and never *retroactively* against the taxpayer." This language was eliminated from the regulations after the 1952 transactions occurred. The Department argues that the new regulation must be applied retroactively because of section 23 of article IV of the constitution which provides: "The general assembly shall have no power to release or extinguish, in whole or in part, the indebtedness, liability, or obligation of any corporation or individual to this state or to any municipal corporation therein." In our opinion this clause of the constitution has no bearing, for the question here is whether or not the taxpayer has become indebted to the State and no question of the release of an existing indebtedness is involved.

There are conceptual difficulties involved in holding that the new regulation is not to be applied retroactively, and they have been pressed upon us by the Department. It is true of course, if abstract logic alone is to be considered, that conduct which the General Assembly has said is to measure a tax cannot be exempted from tax consequences by the regulations of an administrative agency. But neither the statute nor the regulations were intended to operate in an atmosphere sterilized of reality and dominated by logic alone. The statute was designed to apply to the multitudinous affairs of daily life. Its terms were general. The legislature knew that interpretation was inevitable, and it was with this knowledge that the power to make regulations was given to the Department.

Many problems arise in connection with retroactive administrative regulations. (Davis, Administrative Law,

secs. 60, 61.) We need not now attempt to solve them all. The regulation in force when the 1952 transactions occurred was adopted to conform to high judicial authority. The authority of the Department under the act is to make and enforce reasonable rules and regulations relating to the enforcement of the act. (Ill. Rev. Stat. 1953, chap. 120, par. 451.) In our opinion it is unreasonable and inequitable to apply the revised regulation retroactively in this case after the taxpayers had entered into contractual relationships upon the basis of the existing regulation. The policy considerations against retroactive legislation apply with equal force to retroactive administrative regulations which have the force of law.

We are aware that what was said in *Superior Coal Co.* v. *Department of Revenue,* 4 Ill. 2d 459, 468, strongly suggests a contrary view. The transactions which were before the court in that case, however, were consistently taxable under all of the regulations of the Department and what was there said was by way of comment rather than decision.

It follows that the circuit court was led into error by its reliance upon the *Globe Varnish case,* and its decree must therefore be reversed and the cause remanded for further proceedings in accordance with this opinion.

*Reversed and remanded.*