UNION ELECTRIC COMPANY, Plaintiff-Appellee, v. THE DEPARTMENT
OF REVENUE *et al.*, Defendants-Appellants.

Fourth District   No. 4—88—0131

Opinion filed February 9, 1989.

McCULLOUGH, P.J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Bret A. Rappaport, Assistant Attorney General, of Chicago, of counsel), for appellants.

Thompson & Mitchell, of Belleville (Robert L. Broderick and Mark J. Stegman, of counsel), for appellee.

JUSTICE LUND delivered the opinion of the court:

Plaintiff Union Electric Company purchased Illinois coal solely for the use of its Missouri-located generating plants. Because of the method of transferring the coal to Missouri, the Department of Revenue of the State of Illinois (Department) claimed unpaid use taxes, together with penalties and interest. Plaintiff paid the claim taxes, with penalties and interest, under protest and sued for a refund. The circuit court of Sangamon County ruled in plaintiff's favor, ordering the refund. Department appeals.

### TRANSFER OF COAL

Plaintiff contracted to buy coal from two Franklin County, Illinois, coal mining operations, Old Ben Coal Company (Old Ben) and Inland Steel Coal Company (Inland). All coal purchased, now in issue, was to be used at plaintiff's Meramec Power Plant (Meramec) located in the State of Missouri. Meramec coal is delivered solely from barges to the Mississippi River plant site. The coal left both Old Ben and Inland's

Franklin County operations on the Missouri-Pacific Railroad, traveling to Cora Dock Corporation (Cora Dock) at Cora, Illinois, where the coal was transferred from train cars to river barges. Cora, Illinois, a small village on the Mississippi River, is located approximately 45 miles southwest of Benton, the county seat of Franklin County.

CONTRACTS TO DELIVER

Plaintiff's contract with Old Ben provided for the coal to be delivered to Federal Barge for shipment to Meramec. Federal Barge made the arrangements for the use of railroad cars for transportation of the coal from Old Ben to Cora Dock. Missouri-Pacific was the only railroad with lines to Cora Dock, and the only railroad with an applicable tariff. The agreement provided, as to the coal going to Meramec, as follows:

> "[S]hipment shall be for delivery to Federal Barge Lines, a common carrier, or other designated barge common carrier, F.O.B. designated dock for further shipment to Buyer's destination power plant in Missouri. Buyer shall be responsible for scheduling coal shipments via common carrier acceptable to both parties and for unloading coal at its power plants in Missouri."

Plaintiff agreed to reimburse Old Ben for all freight costs paid by Old Ben, except for certain penalties.

Plaintiff's purchase orders, used to buy coal from Inland, show the coal to be shipped "via the MoPac R.R. to the Cora Dock, Cora, Illinois, for transshipment beyond to Union Electric's Meramec Plant *** in Federal Barge Lines barges." Inland prepaid the freight "as specified in the basic order."

Plaintiff contracted with Cora Dock to transfer the coal from rail to barge when arriving at Cora Dock. Cora Dock made all arrangements for the barges, including selection of United Barge Company, a common carrier, to ship the coal to Meramec. Neither Cora Dock nor United Barge was owned by plaintiff.

The January 1, 1981, agreement between plaintiff and Cora Dock Corporation includes the following:

> "WHEREAS, Union has arranged or will arrange with the coal supplier to load cars for the transport of said coal to the coal transfer facility located in the vicinity of Cora, Illinois (hereinafter called 'Terminal'); and
>
> WHEREAS, Union desires to enter into an agreement with Cora pursuant to which Cora will handle and receive unit train deliveries of the coal at the Terminal, transfer the coal to

barges, and transport and deliver said coal by river barges to Union's generating plant known as the Meramec Plant located in St. Louis County, Missouri."

The original term of the January 1, 1981, contract extended from February 1, 1981, through December 31, 1984. A December 18, 1984, amendment, effective January 1, 1985, extended the term of the agreement to April 30, 1985. Other changes made by the amendment are not material to this litigation.

Article III of the contract provided that Cora would provide railcars for delivery of coal to the terminal. Unloading was to be within four hours after arrival of the train. Plaintiff was responsible for paying all charges for loading and transporting the coal destined for the Meramec plant. Cora was responsible for detention charges relative to unloading coal under the applicable tariff. Plaintiff was responsible for reimbursing Cora for any additional expense should the coal arrive at the terminal frozen, should the top coal exceed two inches, or there were excessive fines.

The agreement provided Cora was to exercise reasonable care, and Cora was to obtain cargo insurance for the terminal-to-plant trip.

Cora agreed to let plaintiff or its subcontractor, at plaintiff's "expense and instructions," sample or use the automatic sampler at Cora while the coal was at Cora. The stipulation of facts entered into by the parties stated that while plaintiff had the right to sample or use the automatic sampler at Cora, no sampling was conducted at Cora by plaintiff or anyone else.

The agreement provided Cora was to supply a tow boat and barges. Cora had exclusive control of the methods of unloading, transferring, and loading of barges at the terminal, and of transporting and delivering the coal to the plant.

Article XI of the contract between plaintiff and Cora Dock specified that the agreement would not be construed as a contract by plaintiff for leasing any barge, two boats, or other equipment. None of the subcontractors, agents, servants, or employees of Cora would be regarded as plaintiff's employees. The agreement further stated Cora and its subcontractors "are in all respects independent contractors and *** Union shall exercise no control over such barge, towboats or other equipment or the agents, servants or employees of Cora or its subcontractors except as specifically provided herein." The parties agreed the contract was to be governed by Missouri law.

ILLINOIS USE TAX ACT AND REGULATIONS RELATING THERETO

The Illinois Use Tax Act (Use Tax) (Ill. Rev. Stat. 1983, ch. 120,

pars. 439.1 through 439.51) complements the Retailers' Occupation Tax Act (Sales Tax) (Ill. Rev. Stat. 1983, ch. 120, pars. 440 through 453). The statutory provisions applicable to the present case are from section 3 of the Use Tax, and provide as follows:

"A tax is imposed upon the privilege of using in this State tangible personal property ***. Such tax is at the rate of 5% of either the selling price or the fair market value, if any, of such property as provided herein.

\* \* \*

To prevent actual or likely multistate taxation, the tax herein imposed does not apply to the use of tangible personal property in this State under the following circumstances:

\* \* \*

(g) the use or purchase of tangible personal property by a common carrier by rail which receives the physical possession of such property in Illinois, and which transports such property, or shares with another common carrier in the transportation of such property, out of Illinois on a standard uniform bill of lading showing the seller of the property as the shipper or consignor of such property to a destination outside Illinois, for use outside Illinois;

\*\*\*

If the seller of tangible personal property for use would not be taxable under the Retailers' Occupation Tax Act despite all elements of the sale occurring in Illinois, then the tax imposed by this Act shall not apply to the use of such tangible personal property in this State." Ill. Rev. Stat. 1983, ch. 120, par. 439.3.

The Sales Tax regulations are applicable to the Use Tax, and section 130.605 of the Sales Tax regulations provides, in part:

"(a) Where tangible personal property is located in this State at the time of its sale (or is subsequently produced in Illinois), and then delivered in Illinois to the purchaser, the seller is taxable if the sale is at retail.

(1) The sale is not deemed to be in interstate commerce if the purchaser or his representative receives the physical possession of such property in this State.

(2) This is so notwithstanding the fact that the purchaser may, after receiving physical possession of the property in this State, transport or send the property out of the State for use outside the State or for use in the conduct of interstate commerce.

\* \* \*

(b) The tax does not extend to gross receipts from sales in which the seller is obligated, under the terms of his agreement with the purchaser, to make physical delivery of the goods from a point in this State to a point outside this State, not to be returned to a point within this State, provided that such delivery is actually made.

(c) Nor does the tax apply to gross receipts from sales in which the seller, by carrier (when the carrier is not also the purchaser) or by mail, under the terms of his agreement with the purchaser, delivers the goods from a point in this State to a point outside this State not to be returned to a point within this State.

(d) The place at which title to the property passes to the purchaser is immaterial. *** Sales of the type described in Subsections (b) and (c) of this Regulation are deemed to be within the protection of the Commerce Clause of the Constitution of the United States." 86 Ill. Adm. Code 130.605(a), (b), (c), (d) (1985).

## BILLS OF LADING

The parties included, in the stipulation of facts, copies of Missouri-Pacific Railroad tariffs applicable during the audit period for the rail shipments of coal from Old Ben and Inland to Cora Dock. Also included with the stipulation of facts are copies of Missouri-Pacific's bills of lading used during the same time period for shipments from Old Ben to Cora Dock. These are representative of all the bills of lading used. These bills of lading show Old Ben as the shipper and "Cora Dock A/o Union Electric" as the consignee. The freight bills show under the heading "Lading Description": "Bituminous coal *** unit train movement *** for movement via barge." The parties stipulated shipping documents used for the Inland purchases show the consignor for each shipment as Inland.

Bills of lading used for barge shipments from Cora Dock to the power plant list the shipper as Cora Dock and plaintiff as consignee.

## TRIAL COURT RULING

The trial court concluded Cora Dock was not plaintiff's representative within the meaning of section 130.605(a)(1), and that the transactions in question fell within interstate commerce pursuant to the provisions of sections 130.605(c) and (d) of the regulations.

ISSUE

After an examination of the authorities cited to us, and having considered all of the arguments of the parties, we conclude the actual issue presented is a narrow one. Did a "local incident" ("taxable moment" or "taxable event") take place which triggered the Use Tax? It is not argued that the placing of the coal on the common carrier at the mines, or the subsequent travel by common carrier to Cora Dock, resulted in a delivery as envisioned in *International-Stanley Corp. v. Department of Revenue* (1976), 40 Ill. App. 3d 397, 407, 352 N.E.2d 272, 280, *cert. denied* (1977), 431 U.S. 950, 53 L. Ed. 2d 267, 97 S. Ct. 2667. It is argued by the Department that the transfer at Cora to Cora Dock for loading on common carrier barges was a delivery to plaintiff and provided plaintiff with the privilege of using the coal within Illinois.

DECISION

The Department quotes Justice Ryan's statement in *United Air Lines, Inc. v. Johnson* (1981), 84 Ill. 2d 446, 449, 419 N.E.2d 899, 901: "The Illinois use tax is a tax upon the privilege of using personal property within the State." *United* involved petroleum purchased in Indiana from Shell Oil Company and delivered to United in Illinois for use in United planes. United claimed an exemption from the Use Tax based on payment of Shell's Indiana gross income tax, with the Illinois Supreme Court decision upholding the denial of that exemption. The case did not require an explanation for "taxable event," or a like kind term, such as "local incident" or "taxable moment."

■ A direct delivery from a seller by use of common carrier out of State to a purchaser is free from State tax regardless of where title passes. (86 Ill. Adm. Code 130.605(c), (d) (1985).) It is well settled that once interstate movement has begun, a temporary interruption for safety and convenience, or due to the necessities of the journey, does not take the shipment out of interstate commerce. *Minnesota v. Blasius* (1933), 290 U.S. 1, 9-10, 78 L. Ed. 131, 136, 54 S. Ct. 34, 37.

The interruption may take the goods out of interstate commerce if the interruption is deemed to be for the owner's benefit. (*General Oil Co. v. Crain* (1908), 209 U.S. 211, 52 L. Ed. 754, 28 S. Ct. 475 (oil held for packing and distribution purposes ruled held for owner's benefit and therefore taxable).) Any break in the transportation which would allow the owner to exercise control of absolute ownership has been found sufficient to take the goods out of interstate commerce and make them subject to local taxation. *Bacon v. Illinois* (1913), 227 U.S. 504, 57 L. Ed. 615, 33 S. Ct. 299 (grain removed from carrier

and placed in private grain elevator deemed to be under absolute control of owner, who had power to change consignee, ownership or destination; grain taxable).

The authorities also indicate temporary stoppage of transit in order to change the method of transportation does not change the interstate nature of the journey. *Western Oil Refining Co. v. Lipscomb* (1917), 244 U.S. 346, 61 L. Ed. 1181, 37 S. Ct. 623.

Our courts have recognized "[t]he requirement that a *local incident* occur to bring a sale within the taxing power of a State." (Emphasis added.) (*International-Stanley*, 40 Ill. App. 3d at 407, 352 N.E.2d at 280.) The *International-Stanley* case cites *Norton Co. v. Department of Revenue* (1951), 340 U.S. 534, 95 L. Ed. 517, 71 S. Ct. 377.

■ The arrangement at Cora Dock was necessary because the coal had to arrive at Meramec on barge. Cora Dock was not owned by plaintiff, and the contract between plaintiff and Cora Dock called for transfer of the coal from rail to barges and transfer up the Mississippi River to the generating plant. The evidence indicates Cora Dock was an independent contractor and was not obligated to do anything but transfer the coal from railroad to barge so that the coal could move on by common carrier to Meramec. No explicit authority existed allowing plaintiff to direct otherwise. At no time was coal sidetracked or shipped to another location. The Department is correct in saying a transfer to an Illinois coal use would have been a taxable use by plaintiff, but the transferring by Cora Dock provided for no such event, and none occurred.

The United States Supreme Court, in treating the sale of Tennessee alcohol by mail order, only to those outside of Tennessee, to be interstate commerce, stated:

"But this is immaterial since it is not open to controversy that substance, and not form, controls in determining whether a particular transaction is one of interstate commerce, and hence that the mere method of delivery is a negligible circumstance if, in substantial effect, the transaction under the facts of a given case is interstate commerce." (*Heyman v. Hays* (1915), 236 U.S. 178, 187, 59 L. Ed. 527, 531, 35 S. Ct. 403, 405.)

As further assistance in solving the problem now presented, we also look to the four-part test set forth in *Complete Auto Transit, Inc. v. Brady* (1977), 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076. The United States Supreme Court, while acknowledging the conflicts arising out of the application of sales and use taxes, recently said:

"*Complete Auto* abandoned the abstract notion that interstate

commerce 'itself' cannot be taxed by the States. We recognized that, with certain restrictions, interstate commerce may be required to pay its fair share of State taxes. Accordingly, in the present case, it really makes little difference for Commerce Clause purposes whether appellant's catalogs 'came to rest' in the mailboxes of its Louisiana customers or whether they were still considered in the stream of interstate commerce. This distinction may be of some importance for other purposes (in determining, for instance, whether a 'taxable moment' has occurred, see 505 So. 2d, at 105), but for Commerce Clause analysis it is largely irrelevant." *D.H. Holmes Co. v. McNamara* (1988), 485 U.S. 24, ____, 100 L. Ed. 2d 21, 27, 108 S. Ct. 1619, 1623.

■ In referring to *Complete Auto*, we recognized the great difference in facts from the present case. The Mississippi tax was "for the privilege of carrying on, within a state, certain activities." The taxpayer in *Complete Auto* hauled automobiles from rail loading docks within Mississippi to automobile dealerships in Mississippi. The vehicles had been in interstate commerce, and interstate commerce was assumed. The tax imposed in Mississippi was similar to a sales tax, but was assessed for "sales of transportation services." In upholding the Mississippi tax, the Supreme Court reversed its previous adoption of a rule which "reflects an underlying philosophy that interstate commerce should enjoy a sort of 'free trade' immunity from state taxation." (*Complete Auto*, 430 U.S. at 278, 51 L. Ed. 2d at 330, 97 S. Ct. at 1078-79.) The *Complete Auto* decision requires affirmative answers to four questions prior to upholding the State tax against a commerce clause challenge. The questions are: (1) is the tax applied to an activity with a substantial nexus with the taxing State; (2) is the tax fairly apportioned; (3) is the tax free from discrimination against interstate commerce; and (4) is the tax fairly related to the services provided by the State.

As we have stated, there is a difference between the issues in *Complete Auto* and in the present case because of the question of whether a taxable event, terminating interstate commerce, took place at Cora Dock in the overall process of transferring the coal out of the State of Illinois from the mine to Meramec. Without a taxable event, the transfer would be interstate in nature and free from the taxation. Nevertheless, the *Complete Auto* test provides some guidance because the policy involved appears similar to the one now confronting this court.

The first prong of the *Complete Auto* test appears determinative.

The *activity is limited to the Cora Dock transfer.* Plaintiff was not involved in the interstate movement by the railroad from the mines to Cora Dock. The wording on the bills of lading, while noting the ultimate transfer to Meramec, appears to provide for delivery to Cora Dock. Our supreme court has recognized the designation on a bill of lading does not change what is intrastate commerce to interstate commerce. (*Pressed Steel Car Co. v. Lyons* (1955), 7 Ill. 2d 95, 103, 129 N.E.2d 765, 769.) We assume a designation on a bill of lading is only evidence, and not determinative in itself, whether a sale is intrastate or interstate commerce:

> "Whether commerce is interstate and subject to the regulatory powers of Congress, or intrastate and subject to state control, *should be determined from its essential character. Substance, and not form, controls in the determination of the character of the transaction*; the courts will look to practical considerations and the established course of business." (Emphasis added.) (15A Am. Jur. 2d *Commerce* §8, at 328 (1976).)

If the tax were upheld, it would be because of its application to the very limited activity at Cora Dock. Cora Dock was doing a specific function as an independent contractor, transferring coal from one common carrier to another common carrier. We find the evidence fails to indicate an activity with a substantial nexus with the State of Illinois.

Because the tax would only be collectible because of the activities at Cora Dock, which activities include nothing more than transfers from railroad cars to barges, we question whether the tax is fairly related to services provided by the State of Illinois. It, thus, appears that the fourth prong of the *Complete Auto* test also cannot be answered in the affirmative.

Parenthetically, we note section 130.610 (86 Ill. Adm. Code 130.610 (1985)) specifically provides "representatives" of purchasers do not include "an independent carrier engaged in the business of transporting property for hire." 86 Ill. Adm. Code 130.610(a)(1)(B) (1985); see also 86 Ill. Adm. Code 130.610(b)(4), (c)(1)(D) (1985).

While we recognize these same provisions are not included in section 130.605, it would appear that if Union Electric had purchased coal in Indiana, which was shipped by a common carrier, a railroad not owned by Union Electric, across Illinois to Cora Dock for transfer to another common carrier not owned by Union Electric, Cora Dock would not be considered a "representative" of Union, being nothing more than an instrumentality transferring coal from one common carrier to another. As we have previously said, it is well settled that once

interstate movement has begun, a temporary interruption due to the necessities of the journey does not take the shipment out of interstate commerce. *Blasius*, 290 U.S. at 9-10, 78 L. Ed. at 136, 54 S. Ct. at 37.

We conclude that the contracted services at Cora Dock were not such as to be considered a taxable event, and the tax, as applied, was an unconstitutional infringement upon the interstate commerce. This decision is consistent with the substance over form position referred to in *Heyman* and in *Complete Auto*. Our conclusion also appears to be consistent with the holding of the United States Supreme Court in *R.R. Comm'n v. Worthington* (1912), 225 U.S. 101, 56 L. Ed. 1004, 32 S. Ct. 653.

■ We further conclude the trial court's decision holding Cora Dock was not plaintiff's representative within the meaning of section 130.605(a)(1) was correct. Cora Dock's authority was to do nothing more than transfer the coal for continuing the interstate travel to Meramec. This authority does not equate with the authority to do business with the coal in such a way as to justify a finding of a taxable event (or local incident) as described in *International-Stanley*.

The decision of the circuit court of Sangamon County is affirmed.

Affirmed.

KNECHT, J., concurs.

PRESIDING JUSTICE McCULLOUGH, dissenting:

The parties agree that this is a question concerning a use tax to be imposed by the State of Illinois. First, I question the term "use tax." In Illinois, a use tax is a tax upon the privilege of using personal property within this State. (*United Air Lines, Inc. v. Mahin* (1971), 49 Ill. 2d 45, 46, 273 N.E.2d 585, 586.) As is apparent, the reason for the use tax is to complement the retailers' occupation tax by preventing the evasion of tax on purchases made outside the State and equalize a competitive disadvantage of Illinois retailers who face retailers' occupational tax liability.

The transaction in this case involves a purchase of coal from Old Ben Coal Company and Inland Steel Company. Both coal companies were located in Illinois, and there is no dispute that the coal was in the State of Illinois at the time of its purchase. It is also undisputed that Old Ben and Inland are retailers for the purposes of the Retailers' Occupation Tax Act. Likewise, it is undisputed that the coal purchased was not purchased for the purpose of resale and that the pur-

chase of the coal was not taxed by the State of Missouri or any other State. Contested is whether delivery was in Illinois.

Because of my inability to see the big picture, *i.e.*, that it is other than a sales tax and not a matter of interstate commerce, I would find that the Union Electric Company (Union) is responsible for the tax to the State of Illinois.

On the merits, we need only look to the contract between Union and Cora Dock. In article II, paragraph 5, of the contract, it provided:

> "In the event Union is unable, for any reason, to receive coal from barges at the Plant, then it may request Cora to divert deliveries to an alternate destination. Cora reserves the right to refuse to serve a particular alternative destination because of operating conditions or other circumstances."

Article III requires Cora to cause each unit of a train to be unloaded at the terminal within a specific time period. However, with respect to delivery from Cora to Union, article V provides:

> "It is anticipated by the parties that three or four tows per week shall constitute normal operating conditions under this Agreement. Scheduling of loaded barges and the release of empties shall be in conjunction with the needs of the Plant."

A question in this case: Is there an interruption for the owner's benefit? If there is an interruption, then the property is taxable.

Although Cora Dock was required to unload the trains coming into Cora Dock on a timely basis, *i.e.*, within four hours, there was no similar requirement that the coal move from Cora Dock to Union at any specific time schedule. It appears from reading the contract that the coal could and would be stockpiled at Cora Dock for transfer to Union, the only provision in the contract being that "[i]t is anticipated by the parties that three or four tows per week shall constitute normal operating conditions."

If the purchaser or his representative receives physical possession of the property in Illinois, the sale is not within interstate commerce. This applies even though the buyer may ship the goods out-of-State after receiving physical possession of the property in this State. (86 Ill. Adm. Code 130.605(a)(1), (a)(2) (1985).) With respect to the application of sections 130.605(b), and (c), subsection (b) concerns sales in which the sellers are obligated by agreement with the purchaser to physically deliver the goods from Illinois to out-of-State. In this case, the sellers, Old Ben and Inland, were only obligated to furnish the coal at the loading point at each mine. As to subsection (c), it exempts sales in which the seller, by carrier or by mail, under contract with the buyer, delivers goods from in-State to out-of-State. The arrange-

ments for delivery beyond the point of loading were made by Cora and Union and not by the sellers. Neither of these subsections apply to this case.

Simply stated, Cora Dock acted as plaintiff's representative for purpose of assessing the tax liability under section 130.605(a)(1) of the regulations.

I would also find that the elements of *Complete Auto* are satisfied if applied to this case. The four-part test: (1) the tax must be fairly apportioned; (2) it must not discriminate against interstate commerce; (3) the tax must be fairly related to benefits provided by the State; and (4) there must be a sufficient nexus between the activity and the State. Applying this test, the tax is fairly apportioned, it does not discriminate against interstate commerce inasmuch as it may very well be a simple sales tax or if considered a use tax, it is for property which is not purchased for resale. The tax does not discriminate against interstate commerce, is fairly apportioned, and is related to the benefits provided by the State who provide law enforcement and other governmental services. The coal is taken from the State of Illinois ground, and certainly the operation of the coal mine and the contract provisions provide a sufficient nexus between the activity and the State.

The Supreme Court's application of *Complete Auto* in *Goldberg v. Sweet* (1989), 488 U.S. ___, 102 L. Ed. 2d 607, 109 S. Ct. 582, is further justification to uphold the tax here.