ILLINOIS BELL TELEPHONE COMPANY, Plaintiff-Appellee and Cross-Appellant, *v.* ROBERT H. ALLPHIN, Director of the Department of Revenue of the State of Illinois, *et al.*, Defendants-Appellants and Cross-Appellees.

First District (3rd Division)　No. 79-1869

Opinion filed March 25, 1981.

William J. Scott, Attorney General, and Dore & O'Toole, Ltd., both of Chicago (Cornelius F. Dore, John J. O'Toole, William G. Clark, Jr., and Ilene Davidson, of counsel), for appellants.

James W. Kissel, Henry L. Mason, III, and David W. Carpenter, all of Sidley & Austin, and James R. Bryant, Jr., and R. Dean Irwin, all of Chicago (Howard J. Trienens, Robert D. Allen, and Thomas P. Hester, of counsel), for appellee.

Robert A. Helman, David K. Staub, and Martin G. Rosenstein, all of Mayer, Brown & Platt, of Chicago, for *amicus curiae* Illinois Telephone Association.

Mr. PRESIDING JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Illinois Bell Telephone Company, seeks a declaratory judgment and an injunction enjoining defendant, the Director of the Department of Revenue, from attempting to collect tax liabilities assessed under the Messages Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 467.1 *et seq.*). Illinois Bell claims that certain revenues are not taxable under the Act and that the tax assessed against it is unauthorized by law. On one basic issue, the trial court directed Illinois Bell to pay $115,150,855 in back taxes, penalties and interest. On a second basic issue, the trial court found that Illinois Bell does not owe the approximately $13,160,000 claimed by the Department as additional tax liability, and the trial court permanently enjoined the Department from taking any action to collect that aspect of assessed tax liability. The parties have respectively appealed and cross-appealed, so that both issues are before us. As to the first basic issue, we reverse the order directing Illinois Bell to pay $115,150,855 in back taxes, penalties and interest. As to the second basic issue, we affirm the order enjoining the Department from taking any action to collect that aspect of assessed tax liability.

This complex and voluminous matter has been in litigation since 1973, and before this appeal, it was reviewed in part by the supreme court and remanded to the trial court. (*Illinois Bell Telephone Co. v. Allphin* (1975), 60 Ill. 2d 350, 326 N.E.2d 737.) After a trial, this appeal ensued. In order to present the issues in a comprehensible manner, it is necessary to set forth relevant background facts involving the telephone industry and the Messages Tax Act.

There are approximately 1600 telephone companies in the United States. The largest of these companies is American Telephone and Telegraph. Illinois Bell is a subsidiary of AT&T. In Illinois, there are approximately 60 companies providing intrastate and interstate telephone services for the general public. Illinois Bell is one of these companies. The other companies are neither owned nor controlled by Illinois Bell or AT&T. Each of the Illinois companies operates a regulated telephone business within a geographically designated service area. Illinois Bell's service area encompasses approximately 20% of the Illinois geographic area, including almost all of Cook County.

Illinois Bell and the other 60 companies in Illinois are part of two separately regulated telephone networks: (1) a national telephone network; and (2) an intrastate telephone network. In the national network, the facilities of all the telephone companies in the United States, directly or by interconnection, form a single interstate network.

The companies in the national network share in all the interstate revenues that the network produces; revenues are not divided on a call by call basis. In regard to the sharing of revenues, AT&T, through its Long Lines Department, acts as a clearing house for the entire telephone industry. The interstate revenues are divided among the telephone companies pursuant to formulas contained in division of revenue contracts which allow each company to recover expenses incurred in providing interstate services, plus a reasonable return on the value of the property used in providing interstate services. The formulas used for the division of revenues are approved by the Federal Communication Commission.

Because telephone companies are public utilities, the rates they may charge are determined by administrative agencies. Regulatory authority is divided between State agencies and the Federal Communication Commission. In Illinois, the Illinois Commerce Commission establishes the rates for messages originating and terminating in Illinois; the Federal Communication Commission regulates the rates for messages that either originate or terminate outside of Illinois.

The dichotomy between interstate and intrastate telephone services is reflected historically in messages taxation in Illinois. The first occupation tax on receipts from the transmission of messages was provided in the Public Utilities Tax Act of 1935,[1] followed by the public utilities tax act of 1937 (Ill. Rev. Stat. 1937, ch. 120, par. 468 *et seq.*). These statutes imposed a tax, measured by a percentage of gross receipts, upon persons engaged in the business of transmitting telephone messages in Illinois. In 1935 and 1937, the Illinois Department of Finance issued regulations which provided that the tax was not imposed on revenues from the transmission of messages that either originated or terminated outside of Illinois.

In 1945, the public utilities tax act of 1937 was repealed, and the statute now commonly known as the Messages Tax Act was enacted. This Messages Tax Act, as amended, governs the taxation of telephone, telegraph and similar communications businesses. Ill. Rev. Stat. 1979, ch. 120, par. 467.1 *et seq.*

After the passage of the 1945 act, the Department issued regulations which provide that revenues from messages that either originate or terminate outside of Illinois are not subject to tax under the Act. Also, since 1945, the Department's regulations have required taxpayers to file

---

[1] Ill. Rev. Stat. 1935, ch. 120, par. 440 *et seq.* This Act was held unconstitutional in *City of Chicago v. Ames* (1937), 365 Ill. 529, 7 N.E.2d 294, for reasons not relevant here.

monthly messages tax returns on forms prescribed and furnished by the Department. These tax return forms have continually prescribed that the taxpayer is to compute its taxable gross receipts by subtracting its receipts from services in interstate commerce, recorded on line 4(a), from the amount of total receipts, recorded on line 3A. Accordingly, since 1945, Illinois Bell has filed its monthly messages tax returns on the Department's tax return forms and has deducted its interstate revenues in computing its taxable gross receipts.

In 1970, and 1973, the Department audited Illinois Bell. At the conclusion of the audits, the Department issued notices of tax liabilities in which the Department disallowed Illinois Bell's deductions from gross receipts for the amounts it received under the division of revenue contracts for the transmission of interstate messages between July 1967 and June 1973. The Department also issued notices of tax liabilities for alleged revenues involving intrastate toll messages. Following the issuance of the tax liability notices, Illinois Bell filed this suit.

After a trial, the trial court entered an order and filed an opinion in which it found that the revenues recorded on line 4(a) of Illinois Bell's tax returns were properly classified as interstate revenues. However, the trial court also found that the Act imposes a tax on revenues from interstate messages and that, therefore, Illinois Bell's interstate revenues from 1967 to 1973 were subject to the messages tax. Accordingly, the trial court ordered Illinois Bell to pay $115,150, 855 to the Department of Revenue, which includes payment for back taxes for the period between July 1967 and June 1973, plus penalties and interest. This order and the trial court's findings relating to it constitute the first basic issue on appeal.

The first question we address is whether the Act imposes a tax on revenues from interstate messages. Section 2 of the Act is the section which imposes the tax. It states:

> "A tax is imposed upon persons engaged in the business of transmitting messages in this State at the rate of 5% of the gross receipts from such business * * *. However, such tax is not imposed upon the privilege of engaging in any business in interstate commerce or otherwise to the extent to which such business may not, under the Constitution and statutes of the United States, be made the subject of taxation by this State." (Ill. Rev. Stat. 1979, ch. 120, par. 467.2.)

Specifically, the first sentence of this section imposes the tax and it clearly does not impose a tax on *all* revenues from the transmission of messages. Rather, it imposes a tax only on the transmission of messages *in this State* at the rate of 5% of the gross receipts *from such business*.

The history of messages taxation establishes that the phrase "transmitting messages in this State" means the transmission of messages which

originate and terminate in the same State. In messages taxation, the distinction between messages which originate and terminate in one State, and messages which are interstate, has always been clearly recognized legislatively. Consequently, when a legislative body enacts a messages tax statute which imposes the tax on "transmitting messages in this State," it must be concluded that the legislature intended the tax to apply only to the transmission of messages which originate and terminate in that State. It follows that in this case, the Act only imposes the tax on revenues from the transmission of messages which originate and terminate in Illinois, and it does not impose the tax on revenues from the transmission of interstate messages.

■■ In making its ruling, the trial court focused entirely on the exemption from taxation that is provided in the second sentence of section 2 of the Act. The trial court concluded that the Act, as enacted in 1945, exempted revenues from the transmission of interstate messages,[2] but because (according to the trial court) the United States Supreme Court, at some time after 1945, would constitutionally uphold such a tax on revenues from interstate messages, the taxing scope of the Act has expanded, *sub silentio* and at no definitive point in time, to impose the tax on revenues from interstate messages. We disagree.

The exemption from the taxation in the statute cannot *expand* the taxing scope of the statute. The Act has not been amended since it was enacted in 1945, except for a rate change from 3% to 5%. When statutory language has remained unchanged since enactment, it is the court's duty to continue to give effect to the original meaning of the statutory language, notwithstanding any intervening developments in the law not reflected in the statute. (See *Roth v. Yackley* (1979), 77 Ill. 2d 423, 428, 396 N.E.2d 520, 522.) Also, since the time of its enactment, the Department has continuously interpreted the Act to mean that revenues from interstate messages are not subject to the messages tax. (See Department of Revenue Messages Tax Regulations, Article 12; 1980 Department of Revenue Tax Return Forms for Messages Tax Act, lines 3A and 4(a).) The fact that the statute has remained unaltered through successive sessions of the General Assembly since 1945 evidences legislative approval of the Department's continuous interpretation of the Act. See *People ex rel. Spiegel v. Lyons* (1953), 1 Ill. 2d 409, 414, 115 N.E.2d 895, 898.

On appeal, the Department traces the judicial development of the confrontation between the commerce clause of the United States Constitution and State taxation of interstate activities, and concludes that the judicial interpretation of the commerce clause now, and since the early

---

[2] For the basis of this conclusion see *New Jersey Bell Telephone Co. v. State Board of Taxes and Assessments* (1930), 280 U.S. 338, 74 L. Ed. 463, 50 S. Ct. 111; *Cooney v. Mountain States Telephone & Telegraph Co.* (1935), 294 U.S. 384, 79 L. Ed. 934, 55 S. Ct. 477.

1960's, would permit the taxation of the interstate activities here.[3] However, the issue in this case is not whether taxation of revenues from interstate messages is now, or has been since the early 1960's, constitutionally permissible under an appropriate statute. Rather, the issue is whether the Act as it is written imposes a tax on revenues from the transmission of interstate messages—and it does not.

■■ The Department next contends that the division of revenue payments Illinois Bell receives for interstate messages may not be excluded from Illinois Bell's gross receipts because "with minor exception plaintiff's messages activity takes place wholly within the State of Illinois."[4] However, the Act, as it is written, simply does not impose a tax on receipts from the transmission of interstate messages, and it does not make any distinction between those taxpayers which operate entirely in Illinois and those which also have facilities or activities located outside Illinois. It follows that the location of Illinois Bell's facilities and activities is irrelevant in determining which revenues are subject to taxation under the Act.

The Department also claims that Illinois Bell failed to prove that the revenues at issue are from interstate messages, and that therefore the amounts should not be deducted from line 3A on the tax returns. In this regard, there was an express finding by the trial court "that the revenues which were designated [on the tax returns] as earned interstate revenues were the result of interstate activity." Significantly, the Department does not directly challenge this finding but merely ignores it. Moreover, the record sufficiently establishes that the revenues that are involved are from the transmission of interstate messages. At trial, these revenues were traced through Illinois Bell's bookkeeping system, and it was demonstrated how these revenues represented Illinois Bell's consideration, as determined under the division of revenue formulas approved by the FCC, for Illinois Bell's role in the transmission of interstate messages. We conclude that the trial court's finding on this point is supported by the record.

---

[3] The Department states that the "history of the confrontation of the commerce clause and State taxation of interstate activities has run the gamut from initial 'judicial passport' to the 'privilege[d] sanctuary of tax immunity' through the discarded 'direct-indirect tests' to the modern day 'discrimination and multiple burden tests.' " The Department cites *Washington Telephone Co. v. State* (1970), 77 Wash. 2d 923, 468, P.2d 687, *Complete Auto Transit, Inc. v. Brady* (1977), 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076, and *Department of Revenue v. Association of Washington Stevedoring Co.* (1978), 435 U.S. 734, 55 L. Ed. 2d 682, 98 S. Ct. 1388. The Department contends, and the trial court agreed, that if the modern day "discrimination and multiple burden tests" are applied to State messages taxation upon revenues from the transmission of interstate messages, the constitutionality of the State taxation would be upheld by the United States Supreme Court. In the view we take of this case, we need not decide the question posed by the Department and the trial court.

[4] Illinois Bell also conducted a general telephone business in Indiana during the tax period involved in this case.

The Department also contends that Illinois Bell has failed to report its gross receipts for interstate messages, and therefore, that Illinois Bell "has no cause to complain that a series of tax returns without gross amounts are called into question." In particular, the Department states:

> "The Department's position is that Bell, in its division of revenues with A.T. & T. [*sic*], utilizes a system of accounting which operates to deduct certain expense amounts from its messages revenues so that the 'earned revenue' which it uses as its messages tax base, is a net amount, less than the 'gross receipts' amount mandated by the Act. Bell thus pays less tax than the law requires.
>
> ❈ ❈ ❈
>
> It is important to note that Bell bills its customers an amount for toll messages services. These gross amounts never appear on the Messages Tax Returns filed by plaintiff. Rather, plaintiff reports 'earned revenues,' which are totally incompatible with a gross receipts tax."

■■ We find the Department's contention is without merit because the record manifests that Illinois Bell does report its gross receipts for interstate messages in accordance with the Department's own regulations and in accordance with the Act. Specifically, a telephone company's gross receipts for interstate messages is the share it receives and retains pursuant to the division of revenue formulas under the national network system. The Department's argument that a telephone company's billings in and of themselves represent the company's gross receipts for interstate messages is not in accord with the express definition of gross receipts as provided in the Department's own regulations. Article 10 of the Department's Messages Tax Regulations states:

> "Article 10—Transmission of Messages and Gross Receipts Therefrom
> B. Gross Receipts From Transmitting Messages
>
> ❈ ❈ ❈
>
> Where a message is transmitted over the lines of more than one telephone ❈ ❈ ❈ company, there is one message and one transmission. The gross receipts of each telephone ❈ ❈ ❈ company participating in the joint transmission of such messages are that portion of the total message charge received and retained by each such telephone ❈ ❈ ❈ company as its consideration for its part of such transmission."

Accordingly, Illinois Bell's gross receipts for interstate messages is the consideration it receives and retains pursuant to the division of revenue formulas under the national network system. This is the consideration it receives for the transmission of interstate messages and for all services

rendered in connection therewith.[5] This is the amount Illinois Bell correctly reported.

As a practical matter, telephone companies frequently bill amounts which do not represent their consideration for transmitting interstate messages. Interstate calls require the facilities and services of several telephone companies. However, because only one company will bill the call, and because each company that participates in the interstate message transmission is entitled to a share of the revenues, the billing company will collect some revenues that represent other companies' consideration for the facilities and services they furnished. Also, in the case of some third party and credit card telephone calls, the billing company will not be entitled to any of the amounts collected but will be acting solely as collecting agent for the other companies. For example, as Illinois Bell explains, Illinois Bell will bill a call from New York to Miami if the calling party charges it to a Chicago telephone number, but the amount actually collected by Illinois Bell will not be consideration that is retained by Illinois Bell for the transmission of interstate messages.

Next, the Department's claim that Illinois Bell "utilizes a system of accounting which operates to deduct certain expenses amounts from its messages revenues so that 'earned revenue' which it uses as its messages tax base, is a net amount, less than the 'gross receipts' amount mandated by the Act," is unfounded. Equally without merit is the Department's contention that Illinois Bell pays less tax than the law requires because of the system used in reporting revenues received under the division of revenues for interstate messages.

The sole function of the division of revenue process for interstate messages is to divide the interstate revenues among the participating telephone companies to allow each company to recover expenses incurred in providing interstate services, plus a reasonable return on the value of the property used in providing interstate services. The share each company receives includes both expenses and profit; there is no "netting" in the amount reported as earned revenue for the transmission of interstate messages. No expenses have been deducted. Thus, the amount reported as Illinois Bell's share under the applicable division of revenue formula is the gross total "consideration received for the transmission of messages and for all services rendered in connection therewith." See Ill. Rev. Stat. 1979, ch. 120, par. 467.1.

In addition, on the Department's Messages Tax Act tax return form, line 3A is for the "[t]otal amount of receipts received during the calendar

---

[5] The Messages Tax Act provides: " 'Gross receipts' means the consideration received for the transmission of messages and for all services rendered in connection therewith ° ° °." Ill. Rev. Stat. 1979, ch. 120, par. 467.1.

month." Line 4(a) is for the "[r]eceipts from services in interstate commerce." The amount on line 4(a) is to be deducted from the amount on line 3A. It is indisputable that the same amounts Illinois Bell reported on line 4(a) (*i.e.*, its retained portion of billing for interstate calls) were included in the amounts reported on line 3A. Thus, if Illinois Bell had done what the Department now proposes (*i.e.*.., include 100% of Illinois Bell's interstate billings on line 3A and then substract that figure on line 4(a)), the net result would have been the same. The gross receipts upon which the tax would be imposed (*i.e.*, line 3A less line 4(a)) would equal the amount of intrastate receipts included on line 3A. The gross receipts amount (line 3A less line 4(a)) upon which the tax is imposed would therefore be identical using either system of reporting. Plainly, Illinois Bell did not pay less tax than the law required because of the system used in reporting revenues received under the division of revenues for interstate messages.

■■ The Department's position on the first basic issue under discussion cannot be sustained for another significant reason. Even if we were to conclude that the Act authorized the taxation of interstate revenues, the Department nevertheless may not now retroactively assess the tax on Illinois Bell's interstate revenues. During the tax period involved, the Department's written rules and regulations and tax return forms expressly provided that interstate revenues were not subject to the messages tax, and Illinois Bell accordingly excluded interstate revenues in computing its messages tax liabilities. We conclude that the Department is bound by the express written rules and regulations it mandated the taxpayer to follow. See *Holland v. Quinn* (1978), 67 Ill. App. 3d 571, 574, 385 N.E.2d 92, 94; *Briscoe v. Kusper* (7th Cir. 1970), 435 F.2d 1046, 1055; see also *Pressed Steel Car Co. v. Lyons* (1955), 7 Ill. 2d 95, 105-06, 129 N.E.2d 765, 770-71.

This conclusion follows from the authority given to the Department by the legislature. The Act authorizes the Department to "make, promulgate and enforce * * * reasonable rules and regulations." (Ill. Rev. Stat. 1979, ch. 120, par. 467.12a.) The Act also provides that any "taxpayer * * * who wilfully violates * * * any rule or regulation of the Department for the administration and enforcement of this act, is guilty of a business offense and, upon conviction thereof, shall be fined * * *." (Ill. Rev. Stat. 1979, ch. 120, par. 467.13.) The intent of these statutory provisions would be vitiated if the Department could retroactively, to the detriment of the taxpayer, ignore its own rules and regulations.

A case which supports our conclusion that the Department cannot retroactively ignore its own rules and regulations to the detriment of the taxpayer and retroactively assess a tax when none was due pursuant to the Department's rules and regulations in effect at the time of the tax period, is *Pressed Steel Car Co. v. Lyons* (1955), 7 Ill. 2d 95, 129 N.E.2d 765. In

that case, the court concluded that because the General Assembly gave the Department of Revenue the power to promulgate regulations, it necessarily intended that the taxpayer had a right to rely on the Department's interpretation of the statute as stated in its regulations. Also, the court concluded that retroactive application of the Department's revised interpretation of the statute, to the detriment of the taxpayer, would be unreasonable and inequitable. Specifically, the court stated:

> "It is true of course, if abstract logic alone is to be considered, that conduct which the General Assembly has said is to measure a tax cannot be exempted from tax consequences by the regulations of an administrative agency. But neither the statute nor the regulations were intended to operate in an atmosphere sterilized of reality and dominated by logic alone. The statute was designed to apply to the multitudinous affairs of daily life. Its terms were general. The legislature knew that interpretation was inevitable, and it was with this knowledge that the power to make regulations was given to the Department.
>
> Many problems arise in connection with retroactive administrative regulations. (Davis, Administrative Law, secs. 60, 61.) We need not now attempt to solve them all. The regulation in force when the 1952 transactions occurred was adopted to conform to high judicial authority. The authority of the Department under the act is to make and enforce reasonable rules and regulations relating to the enforcement of the act. (Ill. Rev. Stat. 1953, ch. 120, par. 451.) In our opinion it is unreasonable and inequitable to apply the revised regulation retroactively in this case after the taxpayers had entered into contractual relationships upon the basis of the existing regulation. The policy considerations against retroactive legislation apply with equal force to retroactive administrative regulations which have the force of law." (7 Ill. 2d 95, 105-06, 129 N.E.2d 765, 770-71.)

A corollary to the holding in the *Pressed Steel* case is the principle that once an administrative agency establishes rules and regulations implementing a statute, it is bound to adhere to them so long as they remain in effect. (*Holland,* 67 Ill. App. 3d 571, 574, 385 N.E.2d 92, 94.) The reasonableness of this principle is illustrated by what the court stated in *Briscoe v. Kusper* (7th Cir. 1970), 435 F. 2d 1046, 1055:

> "An agency may be bound by its own established custom and practice as well as by its formal regulations. The Board may not deviate from such prior rules of decision on the applicability of a fundamental directive without announcing in advance its change in policy. This is especially true where, as here, fundamental, constitutionally protected liberties are adversely affected, and those

interested require certain knowledge of what is expected of them by the state. Until such time as the Board makes public its new determination, it is constitutionally prohibited from imposing that rule on unsuspecting persons."

The circumstances in the present case vis-a-vis the Department and Illinois Bell are analogous to those in *Briscoe* with respect to the Board and the "unsuspecting persons." Moreover, under the circumstances here, the unsuspecting person that is adversely affected is not only Illinois Bell. As the amicus curiae convincingly argues, virtually all the independent telephone companies in Illinois and the entire telephone industry in Illinois would be severely affected.[6] This is so because rate determinations for public utilities operate prospectively only. Once established, a telephone company's rates may be increased only if existing rates will not produce future revenues sufficient to both compensate the utility for taxes and other operating expenses attributable to future operations and provide a reasonable future return. The fact that the utility has past deficits or otherwise failed to earn the allowable return from past operations is irrelevant to rate determinations. (See *Federal Power Com. v. Natural Gas Pipeline Co. of America* (1942), 315 U.S. 575, 590, 86 L. Ed. 1037, 1052, 62 S. Ct. 736, 745.) It has been stated that it is "a cardinal principle of ratemaking that a utility may not set rates to recoup past losses, nor may the [ratemaking agency] prescribe rates on that principle. *Nader v. Federal Communications Com.* (D. C. Cir. 1975), 520 F. 2d 182, 202, citing *Galveston Electric Co. v. City of Galveston* (1922), 258 U.S. 388, 395, 66 L. Ed. 678, 683, 42 S. Ct. 351, 354.

The Department has taken the position that it may, to the absolute detriment of the taxpayer who relies on the Department's rules and regulations, totally ignore its own written rules and regulations and retroactively assess a tax when clearly none was due pursuant to the Department's written rules and regulations in effect at the time of the tax period. The Department cites the case of *Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 302, 411 N.E.2d 973, 980-81. To the extent that case may

---

[6] The Illinois Telephone Association (representing the interests of the independent telephone companies) was allowed to appear and file a brief as amicus curiae. The amicus curiae states that the Department has already issued notices of tax liability to some of the independent telephone companies. As of the end of 1979, these notices assess over $27,000,000 in additional taxes, penalties and interest relating entirely to the retroactive disallowance of the deduction for interstate revenues. The amicus curiae also states that it is estimated the proposed tax deficiency of the independent telephone companies continues to mount at the rate of $450,000 per month, and interest on the total proposed retroactive deficiency continues to accrue at the rate of $250,000 per month. As a result, according to the amicus curiae, many of the smaller independent companies will be forced out of business if the Department is allowed to retroactively disallow the deduction of interstate revenues on messages tax returns.

support the Department's contention, it is not in accord with *Pressed Steel Car Co. v. Lyons* (1955), 7 Ill. 2d 95, 105-06, 129 N.E.2d 765, 770-71, and *Holland v. Quinn* (1978), 67 Ill. App. 3d 571, 574, 385 N.E.2d 92, 94. We adopt and choose to follow the rationale and holdings in the latter cases.

Accordingly, in the present case, we conclude that the Department could only have assessed a messages tax on Illinois Bell's interstate messages revenues for the period between July 1967 and June 1973 if it had timely changed its rules and regulations which excluded interstate messages revenues from the tax. Moreover, the Department's rules and regulations continue to provide that interstate messages revenues are excluded from taxation under the Act. Thus, at the present time and during the applicable tax period, the Department's rules and regulations preclude it from assessing the tax on Illinois Bell's interstate messages revenues.

Finally, if the Act was construed to permit the retroactive assessment of the tax on interstate messages revenues, then the Act as written would violate the taxpayer's right of due process of law. Taxing statutes may not be so incomplete, vague, indefinite and uncertain that people of ordinary intelligence must necessarily guess at their true meaning. Here, the facts manifest that the taxpayer in 1967 would not have had any reasonable basis for regarding its interstate messages revenues as being subject to the messages tax. The official government agency charged with making "reasonable rules and regulations" and enforcing the Act (Ill. Rev. Stat. 1979, ch. 120, par. 467.12a) not only expressly authorized the exclusion of interstate messages revenues in making messages tax liability determinations, but provided tax forms directing the taxpayer to exclude these revenues. Thus, in 1967, the only way a taxpayer could have protected himself against a future retroactive tax assessment, interest, penalties and a fine, would have been to guess that the Department's rules, regulations and tax forms would prove to be wrong years later. We therefore conclude that if the Department's present interpretation of the Act in this case is correct, the Act would be arbitrary, vague, uncertain and thus violative of due process of law. (See *People ex rel. Duffy v. Hurley* (1949), 402 Ill. 562, 567, 85 N.E.2d 26, 28-29.) Accordingly, the Department's position cannot be sustained.

As to the first basic issue, we therefore conclude that during the tax period between July 1967 through June 1973, Illinois Bell did not improperly report or calculate the revenues it received from its participation in the transmission of interstate messages. The trial court erred in directing Illinois Bell to pay $115,150,855 in back taxes, penalties and interest.

We next address the second basic issue in the case. This issue generally concerns the intrastate telephone network system and the

method used for the division of revenues from intrastate toll calls. The question presented is whether the amounts received from Illinois Bell by independent companies under the division of revenue agreements for intrastate toll calls are to be included as part of Illinois Bell's gross receipts on its messages tax returns.

In deciding this issue, we first consider the manner in which the intrastate telephone network operates. In the intrastate network, the restricted geographical area of each telephone company is known as the "exchange." This is the area within which telephone customers typically make telephone calls in return for a monthly charge. However, when calls are made between customers in different exchanges, they are ordinarily toll calls and are charged on the basis of the duration of the call and the distance traveled by the call.[7] A number of telephone companies in Illinois only serve a single exchange, while others serve one or more large areas containing as many as 30 contiguous exchanges.

The systems of all telephone companies in Illinois are interconnected, directly or indirectly, so that continuous lines of telecommunications are established by the telephone companies in Illinois. As part of this network, each company has entered into a traffic agreement with each company with which it can directly interconnect. These traffic agreements are approved by the Illinois Commerce Commission before they become effective. Ill. Rev. Stat. 1979, ch. 111 2/3, par. 27(a).

The traffic agreements prescribe the formula and procedure for dividing revenues from calls that travel over facilities of more than one telephone company in Illinois. Illinois Bell does not directly interconnect with each telephone company in Illinois, and it therefore does not have traffic agreements with all Illinois telephone companies. During the tax period in question, almost one-fourth of the companies in Illinois did not directly interconnect with Illinois Bell and therefore did not have traffic agreements with Illinois Bell.

The charges for toll calls are set by tariffs (*i.e.*, a list or scale of prices and charges) that apply uniformly throughout Illinois, and they are based on the time, distance and duration of the call. Under the Public Utilities Act, when more than one company participates in the transmission of a toll call, the revenues are to be divided, and each company is to recover its pro rata share of the charges that are received. See Ill. Rev. Stat. 1979, ch. 111 2/3, par. 42.

The determination of the charge to be collected for any toll call is normally performed by the telephone company that originates the call.

---

[7] Not all multiple exchange transmissions are toll calls. There are areas in which subscribers may telephone adjacent exchanges under special billing arrangements. Also, some subscribers have Wide Area Telephone Service (WATS), enabling them to make unlimited calls between certain areas in the country for a fixed monthly charge.

The originating company will always bill the call unless the calling party directs otherwise. Four items of information are necessary to bill the call: (1) the called number; (2) the calling number; (3) the answer time; and (4) the disconnect time. When the originating company collects these four items of information, the originating company determines the correct charge for the call under the applicable tariffs. Only one company will bill and collect the charges for any single toll call.

Although only one company will bill any single toll call, each company that participates in the transmission is entitled to a fair and equitable share of the revenues. The traffic agreements prescribe both the formula under which the revenues are to be divided and the procedure for ensuring that each company receives its fair share of the amounts billed to Illinois customers for toll calls. No effort is made to divide revenues on a call by call basis, apparently because it would be virtually impossible to keep records of each company's participation in each toll call.

The division of revenue formulas which are used in each traffic agreement are negotiated. This is done pursuant to the Public Utilities Act, which provides that the Illinois Commerce Commission must affirmatively approve any division of revenue contract, even if the parties agree on its terms. (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 27a.) Thus, the respective companies may, and often do, litigate division of revenue disputes. As an example, see *Champaign County Telephone Co. v. Illinois Commerce Com.* (1967), 37 Ill. 2d 312, 226 N.E.2d 849.

There are two different types of division of revenue contracts that may be included in the traffic agreements: (1) a cost contract and (2) an average schedule contract. These two types of contracts are merely different ways of determining each company's share of revenues on the basis of toll services and facilities it furnishes. The companies may elect to utilize either type of contract.

The traffic agreements provide that each company will collect all charges payable by its customers for telecommunications originating or terminating on its system, and will account and be responsible to the other for the latter's portion. There is no necessary relationship between the amount any company bills and the amount that represents its share of the toll revenues. Where a company is not entitled to retain all the amounts it collects, the contracts essentially provide that it has acted as a collection agent for the other contracting company.

The traffic agreements involving Illinois Bell assign Illinois Bell the administrative function of issuing monthly statements that set forth the amount of the independent company's share of the toll revenues. Under the agreements, this is known as the independent company's settlement. Each month, independent companies report to Illinois Bell the statistical

data necessary to compute the division of revenues; the statistical data includes the amount of the independent company's toll billings and the total number of toll messages it handled. Illinois Bell then calculates the independent company's settlement under the applicable formula and issues the independent company a settlement statement.

After the settlement determination, funds are transferred between companies to assure that each company receives its required share of the total toll revenues. If the independent company's toll billings exceed its share of the total revenues as provided in the settlement statement, the independent company remits the difference between the two amounts to Illinois Bell. If the independent company's toll billings are less than its share of the total revenues, Illinois Bell remits the difference to the independent company.

One quarter of the telephone companies in Illinois do not have traffic agreements with Illinois Bell, and they therefore do not settle with Illinois Bell. These companies settle with the independent companies with which they directly interconnect and with which they have their own traffic agreements. These companies report their toll revenue data to a second independent company, which in turn will compute the settlements under the applicable division of revenue formula. Amounts that reflect the difference between each company's billings and its share of the total toll revenues will then be transferred between these companies.

The accounting procedures used by the telephone companies are established by the Illinois Commerce Commission's Uniform System of Accounts which prescribes particular accounts for revenues, expenses and other items. Under this system, telephone companies enter the amount they collect from their customers for toll services in their revenue accounts. The settlement process for the sharing of toll revenues, however, requires adjustments to these revenue accounts so that the revenue accounts reflect the true ownership of the amounts collected.

In the present case, Illinois Bell keeps its books and pays messages tax on an accrual basis. Line 3A of the Department's messages tax return forms (which are used by Illinois Bell) directs the taxpayer to report the total amount of receipts received during the calendar month or period for which the tax return is made. On line 3A, Illinois Bell reports the amount in its revenue account *after* adjustments have been made as a result of the division of revenue process. Since the amounts reported by Illinois Bell are the amounts in its revenue account after the completion of the division of revenue process, the amounts reported by Illinois Bell on line 3A include Illinois Bell's pro rata share of the total toll revenues earned by Illinois Bell and the independent companies with which it has traffic agreements; but they do not include the independent companies' respective pro rata shares of the total toll revenues for intrastate messages.

After conducting the audits in question, the Department issued notices of tax liabilities, claiming that Illinois Bell failed to report all its receipts received on line 3A of its messages tax returns. The amounts in issue represent the independent companies' toll revenues under the traffic agreements with Illinois Bell. In virtually all instances, the figures that represent these amounts appear only in the work papers Illinois Bell used in computing the independent companies' settlements and the resulting settlement statements.[8]

Illinois Bell's position is that the independent companies' pro rata shares of the total toll revenues for intrastate messages are not to be included as part of Illinois Bell's receipts received which are recorded on line 3A of its monthly messages tax returns. The Department's position is that these amounts are not to be regarded as shared revenues but as Illinois Bell's costs and expenses of doing business and therefore should be included as part of Illinois Bell's receipts received which are reported on line 3A of its monthly messages tax returns. The Department claims that as a result, Illinois Bell owes approximately $13,160,000 for messages taxes for the period involved here.

The underpinning of the Department's position is its conclusion that the amounts in issue are part of Illinois Bell's "nondeductible costs and expenses of doing business." The basis for this conclusion appears to be the Department's misconception that Illinois Bell collects the amounts in issue as its consideration for the transmission of toll messages in Illinois, and that it pays the independent companies for furnishing services to Illinois Bell. The Department's view of what occurs is contrary to the evidence.

The evidence plainly establishes that Illinois Bell does not collect or otherwise physically possess all the toll revenues earned by the independent companies with which it has traffic agreements. Each telephone company in Illinois bills its own customers for toll calls. After the billings are received by the independent companies, Illinois Bell merely performs the administrative function of mathematically calculating the amount that each company is entitled to retain under the division of revenue formulas approved by the Illinois Commerce Commission. The only effect of this computation is that amounts are then transferred between companies to reflect the difference between each company's billings and its allocable share of the total toll revenues.

---

[8] The only instances in which Illinois Bell held, even temporarily, any of these amounts, involved the rare settlements with respect to the independent companies where they billed their customers less than they were entitled to receive and retain. Even then, only the difference between the independent company's share and its billings would temporarily appear in Illinois Bell's revenue account.

■■ Thus, in the settlement process, there is no consideration received by Illinois Bell for the transmission of messages. The Act states:

> " 'Gross receipts' means the consideration received for the transmission of messages and for all services rendered in connection therewith * * *." (Ill. Rev. Stat. 1979, ch. 120, par. 467.1.)

Since gross receipts means the consideration received for the transmission of messages, we conclude that Illinois Bell is not subject to a gross receipts tax on the toll revenues earned by the independent companies with which Illinois Bell has traffic agreements.

The Department claims that when independent companies furnish certain facilities and equipment for toll calls in Illinois they are not doing so for themselves but are merely providing facilities and equipment for Illinois Bell, and that their compensation must be termed payments from Illinois Bell for facilities and equipment furnished to it by the independent companies. The Department's contention overlooks the fact that the independent telephone companies equip, own, operate and maintain all their own facilities and equipment, and they do so to provide a telephone service to the public and not to Illinois Bell. These services carry with them the exclusive right and duty to furnish local and toll telephone services and facilities within their own geographical territory. Plainly, the independent telephone companies do not work for and are not a part of Illinois Bell, and they do not lease or rent their facilities and equipment for usage by Illinois Bell.[9] Thus, the Department's contention is untenable.

■■ Moreover, the Department's position would cause double taxation not intended by the legislature. The Act evinces a clear legislative intent to impose only a 5% tax on the total amount billed to Illinois customers for the transmission of telephone messages in Illinois. (Ill. Rev. Stat. 1979, ch. 120, par. 467.2.) If Illinois Bell is to pay a 5% tax on the entire amount of the toll messages billed by itself and by the independent companies with whom it has traffic agreements, and then each of the independent companies is to pay a 5% tax on the respective amounts received and retained by it after the settlement,[10] the total amount that would be taxed would exceed the amount paid by Illinois telephone customers. This anomaly would exist because a certain amount of the charges paid by Illinois telephone customers would be taxed twice. We conclude that this double taxation of the same consumer dollar is not intended by the Act.

---

[9] Section 27 of the Public Utilities Act (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 27(b), (d)) provides that no company may acquire, lease, or otherwise control a second company's facilities without approval from the Illinois Commerce Commission. No such approval by the Illinois Commerce Commission appears in this record.

[10] The Department has taken the position that these amounts may be taxable to the independent telephone companies that receive and retain the revenues as consideration received for the transmission of messages, regardless of whether they are also taxable to Illinois Bell.

On the question of double taxation, the parties have referred to a series of cases in which other gross receipts taxes were held applicable to sales of gas or electricity from a supplier to a distributor, even though the subsequent sale from the distributor to the ultimate consumer would also be subject to the same gross receipts tax. (See *People ex rel. Genesee Light & Power Co. v. Sohmer* (1914), 162 App. Div. 207, 147 N.Y.S. 726, *aff'd* (1914), 212 N.Y. 598, 106 N.E. 1040; *State v. Railway Express Agency* (1941), 210 Minn. 556, 299 N.W. 657; *Commonwealth v. Philadelphia Electric Co.* (1933), 312 Pa. 528, 168 A. 318.) We do not find these cases apposite here. Under the relevant provisions of the Messages Tax Act, the tax is imposed only if the recipient of the services does "not, in turn, receive any consideration in connection therewith." (Ill. Rev. Stat. 1979, ch. 120, par. 467.1.) We interpret this to mean that the General Assembly intended that the messages tax would apply solely to the consideration received by the telephone company that furnished the facilities or services directly to the ultimate consumer. Thus, the Messages Tax Act precludes double taxation, since only the person that directly supplies the facilities or services to the ultimate consumer is subject to the tax. Ill. Rev. Stat. 1979, ch. 120, par. 467.1.[11]

The Department next contends that Illinois Bell's tax returns are improper because Illinois Bell does not file its tax returns on the basis of its gross receipts but rather files its tax returns on the basis of its gross services rendered. This contention is without merit.

Article 6 of the Department's regulations provides that taxpayers may, upon being granted permission by the Department, use any one of three different methods of reporting their messages tax returns: (1) cash received basis by reporting gross receipts; (2) accrual basis by reporting gross amount of transactions; or (3) accrual basis by reporting gross billings of services. Once the Department grants permission to use a basis other than a cash received basis, a taxpayer may change its method of reporting only with the written authorization of the Department. Specifically, article 6 of the Department's Messages Tax Regulations states:

---

[11] The first occupation tax on receipts from the transmission of messages in Illinois was provided in the Public Utility Tax Act of 1935. That act provided that sales for resale were not subject to the tax. (Ill. Rev. Stat. 1935, ch. 120, par. 440.) The 1937 act contained the same provision. (Ill. Rev. Stat. 1937, ch. 120, par. 469.) In 1945, the Public Utilities Revenue Act was repealed, and the Messages Tax Act, limited to messages taxation, was enacted. (Ill. Rev. Stat. 1945, ch. 120, par. 467.1 *et seq.*) The Messages Tax Act does not contain the same sale-for-resale tax exemption wording, but this appears to be because the Act is limited only to the business of transmitting messages, and the concept of a "sale" has no apparent application to a business in which different companies together provide services and revenues which are then divided according to a formula approved by the Illinois Commerce Commission. Thus, we interpret the relevant language in section 467.1 of the Messages Tax Act to have the same effect as the sale-for-resale tax exemption which appeared in the pertinent taxing statute before the Messages Tax Act was enacted.

### "GROSS AMOUNT OF TRANSACTIONS OR BILLINGS BASIS OF TAX

The Department will grant permission to a taxpayer to file returns required by the Act and to pay a tax imposed thereon on the basis of gross amount of transactions, or gross billings of services within the Act, where the taxpayer keeps his books and records in such manner as not conveniently or readily to reflect his gross receipts from services within the Act, but keeps his books and records in a manner which does readily and conveniently reflect the gross amount billed for services within the Act.

Where a taxpayer desires to file returns and pay taxes on the basis of gross amount of services within the Act billed, he shall file written request with the Department for permission to report on this basis * * *.

\* \* \*

Where permission to make returns and pay a tax on a basis of gross amount of services billed has been granted, no change to a gross receipts basis will be allowed except at the end of a tax year ending June 30, and then only upon written authorization of the Department."

Since at least 1935, Illinois Bell has kept its books and records on the basis of gross services rendered during each month. This is an accrual basis of accounting and fits within the term "gross amount of transactions" provided in article 6 of the Department's regulations. In this regard, a letter dated August 28, 1935, from Illinois Bell to the Illinois Department of Finance states:

"In connection with our request (Form F. U. 20) for permission to report under the Public Utility Tax Act on the basis of the gross amount of services billed rather than upon gross receipts, and your authorization for us so to do:

Our books are kept upon the basis of the gross services furnished during each month. It was on this basis that our return was made to you on August 15th for the month of July, 1935.

We are interpreting the words 'amount of services billed,' as our billing for services rendered during the calendar month reported. The report would include the services furnished, regardless of when they were billed. We understand that you interpret this phrase in the same way, but want to have the matter clear between us.

We would appreciate it very much if you would, by letter, confirm this interpretation of the words."

In a letter dated August 30, 1935, the Illinois Department of Finance replied:

"In view of the facts stated in your letter of August 28, we advise that the procedure outlined in this letter is satisfactory to this Department."

Accordingly, since that time, Illinois Bell has been reporting and filing its messages tax returns on the accrual basis, reporting gross services rendered during each month, rather than on the cash received basis. As a practical matter, this merely means that Illinois Bell files its tax returns on the basis of services furnished during the month regardless of whether the services furnished were billed or paid for during that month. This method of accounting and reporting, which was expressly authorized by the Department, affects only the time of the reporting of receipts, not the total amounts eventually reported and taxed.

■■ Under the circumstances, the Department's position here is unavailing. Once the Department establishes its own rules and regulations implementing the statute pursuant to the legislative authority given to it, it is bound to adhere to those rules and regulations so long as they remain in effect. Moreover, the Department's custom and practice in interpreting its own rules and regulations may bind the Department. (*Holland v. Quinn* (1978), 67 Ill. App. 3d 571, 574, 385 N.E.2d 92, 94; *Briscoe v. Kusper* (7th Cir. 1970), 435 F.2d 1046, 1055.) Here, we conclude that the Department is bound by its own rules and regulations and its own custom and practice in interpreting those rules and regulations. Thus, the Department's contention that Illinois Bell's messages taxes were improperly reported is without merit.

Lastly, as to the second basic issue, the Department contends that even if its position is not sustained on the merits, the trial court erred in enjoining the Department from taking any action to collect that aspect of assessed tax liability. The Department argues that an injunction may not be entered to enjoin the assessment or collection of an erroneous tax, and that the issuance of an injunction was improper because a declaratory judgment could have been entered. We disagree.

■■ This case does not involve an erroneous tax but rather a tax unauthorized by law. The supreme court specifically held that the complaint in this case alleges facts sufficient to establish that the Department has assessed taxes which are unauthorized by law. (*Illinois Bell Telephone Co. v. Allphin* (1975), 60 Ill. 2d 350, 362, 326 N.E.2d 737, 744.) As discussed herein, the record manifests that these allegations are established by the evidence. Thus, the injunction was properly entered because under the holding in *Allphin*, the court had jurisdiction in this case to enjoin the collection of these taxes. *Allphin*, 60 Ill. 2d 350, 362, 326 N.E.2d 737, 744.

■■ The Department's arguments that the availability of a declaratory judgment somehow precludes the issuance of an injunction is also without merit. Declaratory judgment relief is not an exclusive remedy. (See

*Kupsik v. City of Chicago* (1962), 25 Ill. 2d 595, 598, 185 N.E.2d 858, 860.) The availability of declaratory relief does not restrict the court's powers. Rather, the availability of declaratory relief merely adds to existing remedies, such as an injunction. (See *Gibraltar Insurance Co. v. Varkalis* (1969), 115 Ill. App. 2d 130, 136-37, 253 N.E.2d 605, 608, *aff'd* (1970), 46 Ill. 2d 481, 263 N.E.2d 823.) The injunction was therefore proper in this case even though Illinois Bell may also have been entitled to a declaratory judgment. See *Saxon-Western Corp. v. Mahin* (1980), 81 Ill. 2d 559, 567, 411 N.E.2d 242, 247, where an injunction was issued against the Department of Revenue, enjoining it from assessing or collecting a gross receipts tax, even though the plaintiff sought a declaratory judgment and injunctive relief.

Accordingly, as to the first basic issue, the order directing Illinois Bell to pay $115,150,855 to the Department of Revenue of the State of Illinois in back taxes, penalties and interest is reversed. As to the second basic issue, the order permanently enjoining the Department of Revenue of the State of Illinois from taking any action to collect that aspect of assessed tax liabilities against Illinois Bell is affirmed.

Affirmed in part and reversed in part.

McNAMARA and McGILLICUDDY, JJ., concur.